FRANK BRUNCKHORST CO.
et ano., Plaintiffs,

v.

G. HEILEMAN BREWING CO.,
INC. et ano., Defendants.

No. CV–94–3700 (CPS).

United States District Court,
E.D. New York.

Dec. 22, 1994.

**970**

Hoffman & Baron, Jericho, for plaintiffs.

Sonnenchein Nath & Rosenthal, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This is an action alleging violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, trademark infringement and false designation of origin, 15 U.S.C. §§ 1114, 1125(a), and common law trade dress infringement. The action is brought by plaintiffs, Frank Brunckhorst Co. ("Brunckhorst") and Boar's Head Provisions Co., Inc. ("Provisions"), against defendants, G. Heileman Brewing Co., Inc. ("Brewing") and Heileman Holding Company ("Holding" and collectively with Brewing, "Heileman"). Jurisdiction exists over the case under 28 U.S.C. § 1331 and 15 U.S.C. § 1121, and principles of pendent jurisdiction.

The matter is currently before the Court on plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek an order enjoining defendants' continued advertising and sale of beer under the name "Boar's Head" pending trial of this action.

The parties have submitted affidavits and documentary evidence in support of and in opposition to this motion. Because the facts are essentially undisputed and because the parties agree that no hearing is needed to assess credibility or weigh evidence, no hearing was held. Nor is one required. *Drywall Tapers & Pointers Local 1974 v. Local 530*, 954 F.2d 69 (2d Cir.1992); *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir.1987); *SCM v. Xerox*, 507 F.2d 358 (2d Cir.1974); *CFTC v. American Bd. of Trade,*

*Inc.*, 473 F.Supp. 1177, 1178 n. 3 (S.D.N.Y. 1979).

For the reasons that follow, plaintiff's motion for a preliminary injunction is granted. What follows sets forth the findings of fact and conclusions of law on which the determination to grant these motions is based as required by Rule 65 of the Federal Rules of Civil Procedure.

## THE PARTIES

Plaintiffs Brunckhorst and Provisions are the successors to a family business that was started in New York in 1905 by Frank Brunckhorst. Brunckhorst markets and sells meats, cheeses and other food products ("Boar's Head Products") under the marks BOAR'S HEAD, BOAR'S HEAD BRAND and a logo that includes the head of a boar inside a circle or oval (the "Boar's Head Logo" and, collectively with the other marks, the "Boar's Head Marks"). Provisions acquires and processes raw materials for sale exclusively to Brunckhorst. Independent distributors purchase food products from Brunckhorst and in turn sell them to delicatessens and other food markets for distribution to the public.

Defendants Heileman brew and sell beer under a variety of tradenames. Among these is the Blitz–Weinhard Brewing Company, which has been in existence since 1856 selling beer under the Weinhard name. Defendant Brewing is a wholly owned subsidiary of defendant Holding.

## BACKGROUND

### Plaintiffs and Their Products

Brunckhorst has been marketing and selling Boar's Head Products continuously since 1905. Included in the Boar's Head product line are slicing meats (such as ham, roast beef, bologna, salami, pastrami, and turkey), cheese, hot dogs, hamburgers, mustard, sauerkraut and horseradish. The Boar's Head Marks have been used in conjunction with the Boar's Head Products for nearly the entire century that Brunckhorst has been in

business.[1] A photograph produced by plaintiffs depicts a horse-drawn wagon presumably carrying Brunckhorst's Boar's Head Brand products with the Boar's Head Logo prominently displayed on the wagon. Products sold under the Boar's Head Marks are at present distributed by Brunckhorst throughout much of the United States by distinctive red and black trucks bearing the Boar's Head Logo on the side.

Brunckhorst is the owner of a federal trademark registration (U.S. Trademark Reg. No. 1,789,549), dated August 31, 1993, for the mark BOAR'S HEAD BRAND for slicing meats and cheeses sold in the United States.[2] Although the entire mark as registered is BOAR'S HEAD BRAND, protection for the word "Brand" is disclaimed in Brunckhorst's federal trademark registration. Moreover, much of Brunckhorst's advertising refers to the products simply as Boar's Head Products. Brunckhorst has also filed a federal trademark application (U.S. Trademark Application No. 74/450,531) for the Boar's Head Logo for slicing meats and cheeses, packaged hamburgers, condiments, frankfurters and bacon, and packaged sauerkraut.

Brunckhorst markets and sells its food products under the Boar's Head Marks in over thirty states. Of particular significance for purposes of this motion, these states include Colorado, California, and Washington, where Boar's Head Products have been sold since at least 1984, 1985, and 1988, respectively. In the five year period between January 1, 1989, and December 31, 1993, Brunckhorst has enjoyed over one billion dollars in sales of Boar's Head Products throughout the United States.

The Boar's Head Marks are displayed prominently on Boar's Head Products. The packaging or labels used with Boar's Head Products generally position the mark BOAR'S HEAD BRAND immediately adja-

cent to the Boar's Head Logo. Brunckhorst advertises its Boar's Head Products on radio and television, in print media, and in point-of-sale advertising, using the Boar's Head Marks. The company has spent over eleven million dollars on advertising in the past five years, including advertising in the states of Colorado, California, and Washington.

The distributors of Boar's Head Products also engage in advertising of the products at a cost not included in the $11 million figure spent by plaintiffs alone. Rocky Mountain Provisions, a Colorado distributor of Boar's Head Products, for example, has spent over $100,000 since 1984 promoting Boar's Head Products using the Boar's Head Marks within that state.

Brunckhorst also makes available point-of-sale advertising displays to retail stores which carry Boar's Head Products. This advertising includes price markers, fliers, stickers, clocks, and display boards and is also not included in the $11 million figure referred to above. Of particular note for present purposes, these point-of-sale materials include beer mugs bearing the Boar's Head Marks, which are recommended to be used by retail outlets, placed on counter tops, and filled with Boar's Head Brand beef sticks. Brunckhorst has distributed thousands of such beer mugs since introducing them in 1988. Other beverage related promotional materials include beer steins, coasters, and Oktoberfest advertising materials, all prominently displaying the Boar's Head Marks.

With respect to the use of the Boar's Head Marks in connection with the marketing of beer, Brunckhorst was approached in October 1992 by Grolsch Importers, Inc. in an effort to establish a joint venture or licensing arrangement pursuant to which Grolsch would produce and distribute a beer under the mark BOAR'S HEAD. Brunckhorst declined this proposal after giving it serious

---

1. In its trademarks applications, Brunckhorst states that it has been using the Boar's Head Marks, including BOAR'S HEAD BRAND, BOAR'S HEAD, and the Boar's Head Logo, since before January 1, 1930, and has been using them in interstate commerce since before January 1, 1976.

2. Brunckhorst first filed for federal trademark registration of the BOAR'S HEAD BRAND mark and Boar's Head Logo in 1985. These applications were deemed abandoned in 1987 for the failure to respond to a trademark office inquiry, which resulted in the subsequent trademark applications noted above.

consideration but remains open to other proposals to expand its business into the field of beer distribution.

Since its inception in 1905, Brunckhorst has attempted to establish and maintain high quality in its products, which has undoubtedly contributed to the company's success. Boar's Head Products are sold fresh by Brunckhorst to its distributors, who are required to carefully monitor their retail customers' handling of those products to insure that they are properly displayed and sold fresh to the consumer.[3]

### Defendants and Their Products

Defendants market and sell beer under, *inter alia*, the Weinhard trade name. These beers include Henry Weinhard's Private Reserve and Weinhard's.

■ Defendants are the owners of a federal trademark registration (U.S. Trademark Reg. No. 1,363,650), dated October 1, 1985, for the design mark THE ORIGINAL BLUE BOAR BRAND for beer (the "Blue Boar Mark") and is also the owner of the federal trademark WEINHARD'S (U.S. Trademark Reg. No. 1,423,162), dated December 30, 1986, for alcoholic malt beverages. The Patent and Trademark Office has granted these marks incontestable status for beer and malt products.[4]

Defendants have used the Blue Boar Mark continually in commerce since 1984, when it introduced a line extension called Weinhard's Ale. Subsequent line extensions included Weinhard's Ice Ale, Weinhard's Draft, and Weinhard's Draft Light. The labels for these products prominently display the Weinhard tradename and the Blue Boar Mark directly above the words "Blue Boar." Defendants have used the Weinhard's tradename, the Blue Boar Mark and the boar motif in its advertising and promotions.

3. As a result of these policies, Boar's Head Products have earned the recommendation of a leading consumer products magazine, *Consumer Reports*.

4. Incontestable status is a designation by the Patent and Trademark Office granted after the mark has been used continually in interstate commerce for at least five years subsequent to its registration. The status conveys to the registrant of the mark an incontestable right to use the

In April 1994, defendants introduced a beer under its Weinhard's label. This product is a red beer.[5] The label for this new product prominently displays the Weinhard tradename and the Blue Boar Mark. The beer is sold under the trade name "Weinhard's Boar's Head Red" and has a circular logo adjoining the words "Boar's Head" with the Blue Boar Mark contained within ("Boar's Head Beer").

Defendants allege that Boar's Head Beer was intended as an extension of defendants' product line to capitalize on the Weinhard's name and the blue boar promotional materials, with the name "Boar's Head Red" intended to rhyme and be a memorable bar call. Unlike the other beers sold under the Weinhard's label, which carry the words "Blue Boar" beneath the Blue Boar Mark, Boar's Head Beer carries the words "Boar's Head" beneath the Blue Boar Mark. The name "Boar's Head Red" is used on the bottle cap of the Boar's Head Beer without any reference to Weinhard's, whereas Weinhard's Ale contains the name "Weinhard's Ale" on the bottle cap.

Boar's Head Beer was first introduced in Oregon, Washington, Idaho, Montana, and Arizona. It is now being sold in California and Colorado as well, which together with Oregon are states in which Brunckhorst markets and sells its Boar's Head Products. Defendants state that Boar's Head Beer is currently available in 22 states in all and will soon be marketed in all 50 states.

Defendants distribute the Weinhard's family of beers, including Boar's Head Beer, through its national system of wholesale beer distributors. These distributors carry other beer brands besides those sold by defendants. Boar's Head Beer is advertised on the radio, billboards, and in the print media.

mark in commerce for the goods for which its was registered. 15 U.S.C. § 1065. For marks that obtain incontestable status, lack of distinctiveness of the mark cannot be argued in litigation since distinctiveness is presumed. 1 McCarthy on Trademarks § 11.16[2], at 11–74.2 (1993).

5. A red beer is one in which the barley is roasted in the brewing process, causing the beer to take on a red or amber hue. Red beers have apparently become popular in recent years.

Defendants anticipate spending over $4 million dollars promoting Boar's Head Beer during 1994. However, over $2.8 million of this figure represents point-of-sale advertising while less than $50,000 is devoted to the more long-term consumer promotion. Defendants' target market for all the Weinhard products is males, age 21 to 34 years of age. Weinhard's beers are sold in numerous retail outlets, including delicatessens, which also sell Boar's Head Products.

Attached to the affidavit of Michael Gambino, a Boar's Head distributor in Redlands, California, are pictures of a delicatessen in California that sells both products. In this picture, which is presumably not posed, a beer cooler containing Boar's Head Beer is situated directly behind a Boar's Head Brand banner and hot dog umbrella and near other Boar's Head Brand point-of-sale displays.

Affidavits from Boar's Head distributors in California and Washington also demonstrate confusion among consumers as to the origin of Boar's Head Beer. The Gambino affidavit states that he has received calls from at least two dozen retail customers in California wanting to know when the distributor went into the beer business and whether Boar's Head Beer is available through his distributorship. The affidavit of a Boar's Head distributor in the State of Washington, states that he has received comments from at least thirty customers as well as neighbors who know him as a meat and cheese distributor about Boar's Head Beer and inquiring when he got into the beer business. A third affidavit, from a Boar's Head distributor in the Denver, Colorado area, states that he has received inquiries from customers asking whether there was any connection between the Boar's Head Products and Boar's Head Beer. Further, this affiant states that some of his employees, driving trucks with Boar's Head decals on the side, have been asked by customers in the Denver area whether they were delivering Boar's Head Beer.

Defendants have engaged in significant advertising, apparently aimed at the same market as that to which Brunckhorst addresses its advertising. In Washington State the local distributor attests to billboards, trucks, and radio advertising for the beer and having seen the beer on display in stores. In California, billboards advertise the beer. In Colorado, as well, billboards and radio advertise the beer.

Plaintiffs also produce affidavits from two beer, wine, and liquor store owners in Aurora and Littleton, Colorado. Both of these individuals state that they initially believed that Boar's Head Beer was connected with Boar's Head Products. Both have received point-of-purchase materials for Boar's Head Beer from beer salesmen.

Defendants introduce a survey conducted by Philip Johnson of Leo J. Shapiro & Associates, a market research firm, which they contend disproves the likelihood of any confusion in the marketplace (the "Johnson Survey"). The Johnson Survey consists of (i) a national study (the "National Study"), conducted over the telephone between November 1 to 7, 1994, with a sample of 600 households randomly generated from a computerized sampling program and (ii) a market study (the "Market Study"), which consisted of non-random, face-to-face interviews from October 29 to November 5, 1994, conducted by intercept in shopping malls in Tacoma, Washington; Denver, Colorado; and Los Angeles, California.[6]

The random National Study asked the respondents a series of questions about Boar's Head Red beer.[7] Of the 600 respondents, only 27% had heard of the beer, and only 6%, or 38 respondents, had a belief as to the

---

**6.** Roughly 40% of the respondents in both surveys indicated that they purchased beer at least once a month, and between two-thirds and three-quarters of the respondents in both surveys indicated that they do the primary food shopping in their household.

**7.** Among the questions were:
"Have you ever heard of Boar's Head Red Beer?"

"Based on what you know about it or what I have told you, do you have a belief about who or what company makes or manufactures Boar's Head Red Beer?"
**IF YES:** "Who or what company?"
"And, do you believe *OR* do you not believe that the company that makes or puts out Boar's Head Red Beer makes or puts out any other products?"
**IF YES:** "What other product or products?"

manufacturer of the beer. Of those who had such a belief, 10 respondents, or 26%, believed that "Boar's Head" manufactured the beer, and 3 respondents, or 8%, believed that the manufacturer was "Boar's Head Meat/deli company." Of the 600 respondents, 114, or 19%, believed that the manufacturer of Boar's Head Beer made another product; 136, or 23%, did not believe that the manufacturer of Boar's Head Beer made another product; and the remaining 58% had no opinion on the subject. Of those who had a belief that other products were made by the manufacturer, 36, or 32%, believed that the other product was beer; 17, or 15%, believed that such other product was meat, cheese or deli products; and 48, or 42%, had no opinion on the subject.

In the non-random Market Study, respondents were exposed to a color photocopy of an actual advertisement for Boar's Head Beer[8] and asked a series of questions.[9] Of the 300 respondents, 72, or 24%, had heard of the beer, and 114 respondents, or 38%, had a belief as to the manufacturer of the beer. Of those who had such a belief, 100 respondents, or 88%, believed that Weinhard's manufactured the beer, whereas 5 respondents, or 4%, believed that the manufacturer was "Boar's Head." No respondents believed that the manufacturer was Boar's Head Meat/deli company. Of the 300 respondents, 136, or 45%, believed that the manufacturer of Boar's Head Beer made another product; 51 respondents, or 17%, did not believe that the manufacturer of Boar's Head Beer made another product; and 112, or 37% had no opinion. Of those who had such a belief, 98, or 72%, believed that the other product was

beer; 4, or 4%, believed that the other product was meat, cheese or deli products; and 16, or 12%, had no opinion.

Boar's Head Beer is the only product marketed and sold by defendants with the words "Boar's Head" as opposed to "Blue Boar" underneath the Blue Boar Mark. Plaintiffs seek to enjoin defendants' use of the mark "Boar's Head" in conjunction with the marketing and sale of Boar's Head Beer. Plaintiffs do not challenge defendants' use of the Blue Boar Mark in conjunction with any beer sold by defendants.

## DISCUSSION

■ In order for a preliminary injunction to issue, plaintiffs must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Communications Workers of America, Dist. One, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir.1990); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979).[10]

■ The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Bell and Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983), and the moving party must show that injury is likely before the other requirements for an injunction will be considered. Irreparable harm must be

8. The advertisement shown was of a pilsner glass of beer on a red background with the words "Ferociously Smooth" superimposed on the bottle. At the bottom, in smaller letters, and next to a picture of a bottle of Boar's Head Beer, was the phrase "Boar's Head Red. The richer more flavorful lager from Weinhard's. Drink New Boar's Head Red."

9. The key questions were:
"Here is an advertisement. Please take a look at it and feel free to comment on anything that strikes you either positively or negatively."
"Have you ever seen or heard of this before?"
"Based on what you know about it or see here, do you have a belief about who or what company makes or manufactures this?"

IF YES: "Who or what company?"
"And, do you believe do you not believe that the company that makes or puts out this makes or puts out any other products?"
IF YES: "What other product or products?"

10. As will be discussed below, the Court's analysis of likelihood of confusion must be supplemented by a consideration of the balance of the equities. In balancing the equities, the Court must first inquire whether the instant case presents any likelihood of confusion and, if it does, then proceed to strike the balance of equities. *Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785, 788 (E.D.N.Y.1983) (citations omitted).

shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989).

■ In a trademark case, establishing a "high probability of confusion as to sponsorship almost inevitably establishes irreparable harm" and is also evidence of probable success on the merits. *Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 41 (2d Cir.1986); *Tetley*, 556 F.Supp. at 788 (E.D.N.Y.1983) ("the issues of irreparable injury and success on the merits are intertwined"). Since the likelihood of confusion standard is relevant to both elements of the preliminary injunction test, the issue of irreparable injury will be addressed after consideration of plaintiffs' likelihood of success on the merits.

■ The standard by which to judge likelihood of success is whether the plaintiffs "make a showing that the probability of [their] prevailing is better than fifty percent. There may be considerable room for doubt." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir.1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985)). As to likelihood of success on the merits, a prima facie case for violation of the Lanham Act for trademark infringement, 15 U.S.C. § 1114, or unfair competition, 15 U.S.C. § 1125, is established by showing (i) the use by another of plaintiffs' valid trademark (ii) in a way that is likely to confuse consumers as to the source of the product. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986).

■ The first question to be resolved is whether plaintiffs' marks are entitled to protection under the Lanham Act. The existence of a trademark registration is prima facie evidence of a valid trademark. *Lois Sportswear*, 799 F.2d at 871. In the absence of a trademark registration, however, a mark may still merit protection. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988).[11]

■ This Circuit has adopted Judge Friendly's continuum of categories to ascertain the degree of protection to which a trademark is entitled: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). A generic mark is a mark which simply describes the type of goods and is generally ineligible for trademark protection; a descriptive mark is one that describes one or more of a particular product's features, qualities or ingredients; a suggestive mark employs terms that suggest, as opposed to describe, a feature of the product, requiring the purchaser to use imagination, thought, and perception to see the connection between the name and the feature; and an arbitrary mark is one with no relation to the goods it indicates. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). To be eligible for Lanham Act protection, generic and descriptive marks must have acquired a secondary meaning, in other words a significance independent of the words themselves in the minds of consumers. *Id.* Suggestive and arbitrary marks, however, do not need a secondary meaning to be entitled to trademark protection. *Hasbro v. Lanard*, 858 F.2d at 73. Suggestive and arbitrary marks may, of course, through use, have acquired a secondary meaning in which case they have particular strength.

The marks BOAR'S HEAD and BOAR'S HEAD BRAND and the Boar's Head Logo have been in continual use in interstate commerce for many years. Defendants concede that the Boar's Head Marks are at least suggestive and that the mark BOAR'S HEAD BRAND is a registered trademark. As such, the marks are entitled to protection without proof of a secondary meaning. *Hasbro*, 858 F.2d at 73. Nevertheless, as noted below, the marks appear to have acquired a significance independent of the words themselves in identifying plaintiffs' products.

■ The standard for assessing a likelihood of confusion in this Circuit was established in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d

---

**11.** Plaintiffs' BOAR'S HEAD BRAND mark is registered and, as such, is presumptively entitled to trademark protection. Plaintiffs' Boar's Head Logo is not registered.

25 (1961). There, Judge Friendly wrote that the likelihood of confusion as to product source should be evaluated by balancing the following factors: (1) the strength of the prior owner's mark, (2) the similarity between the two marks, (3) the competitive proximity of the products, (4) the likelihood that the prior user will bridge the gap, (5) actual confusion, (6) the defendant's good faith, (7) the quality of the defendant's product, and (8) the sophistication of the buyers. 287 F.2d at 495. This list is not exhaustive and " 'no single *Polaroid* factor is determinative.' " *W.W.W. Pharmaceutical*, 984 F.2d at 572 (citation omitted).

### Strength of the Mark

■ The focus under this factor is on the "distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Turning on its "origin indicating quality in the eyes of the purchasing public," a mark's strength is assessed using two factors: (i) the degree to which it is inherently distinctive and (ii) the degree to which it is distinctive in the marketplace. *Id.* at 1131–33.

To gauge the inherent distinctiveness of a mark, courts use the same continuum of four categories—generic, descriptive, suggestive, and arbitrary or fanciful—set forth in *Abercrombie & Fitch*. 537 F.2d at 9.[12]

■ The parties dispute whether the Boar's Head Marks are suggestive, on the one hand, or arbitrary, on the other, as to the products they designate, namely, food products such as slicing meats and cheeses, hot dogs, hamburger and condiments. Since the consumption of wild boar and, more particularly, ham cheeks is limited in this country, the argument that the marks are suggestive

is the less persuasive. However, regardless of whether the Boar's Head Marks are arbitrary or suggestive, they may be considered inherently distinctive as long as they are more than descriptive, which the parties here agree they are. *McGregor–Doniger*, 599 F.2d at 1132.

■ A finding that a mark is inherently distinctive does not guarantee a determination that the mark is a strong one, since inherent distinctiveness does not guarantee distinctiveness in the marketplace (else, where would the public relations business be?). *W.W.W. Pharmaceutical*, 984 F.2d at 572.[13] While many arbitrary and suggestive terms may be conceptually and inherently strong, if they receive little publicity because of meager advertising and feeble sales, they are relatively weak marks where it counts, that is, where the product is sold. *Oxford Indus., Inc. v. JBJ Fabrics, Inc.*, 6 U.S.P.Q.2d 1756, 1760, 1988 WL 9959 (S.D.N.Y.1988); *see also W.W.W. Pharmaceutical*, 984 F.2d at 573; *Lang*, 949 F.2d at 581. In evaluating a mark's strength, the court thus must proceed to the second part of the test, the degree to which it is recognized in the marketplace and whether it enjoys a secondary meaning. *W.W.W. Pharmaceutical*, 984 F.2d at 572–73.

The Second Circuit has stated that " '[t]o establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir.1992) (quoting *Inwood Labs v. Ives Labs*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)). Therefore, "the crux of the doctrine of secondary meaning 'is that the mark comes to identify not only the goods, but the source of those goods,' even though the rele-

---

**12.** A finding that a mark is entitled to trademark protection as a result of its being suggestive or arbitrary "is not necessarily dispositive of the issue of the strength of the mark." *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir.1991).

**13.** *But see Paddington Corp. v. Attiki Importers & Distrib.*, 996 F.2d 577, 585 (2d Cir.1993) (holding

that an arbitrary mark is strong without a showing of secondary meaning, disagreeing with line of cases cited in *W.W.W. Pharmaceutical*, 984 F.2d at 573). *Paddington*, however, applies solely to trade dress cases. In all events, as discussed below, plaintiffs' marks have strong meaning.

vant consuming public might not know the name of the producer." *Centaur Communications Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987) (citation omitted).

■ Plaintiffs have shown that they will likely establish at trial that the Boar's Head Marks have that secondary meaning for consumers. The Boar's Head Marks have been used exclusively by plaintiffs for over 80 years. During this period, the Boar's Head Marks have been consistently used in advertising, promotional, and informational materials. In the last five years, Brunckhorst has spent large sums advertising the Boar's Head Products, advertising which has been recognized by trade publications as highly effective in building brand awareness with consumers. *See, e.g., McGregor–Doniger,* 599 F.2d at 1132 ("[p]roof of secondary meaning acquired perhaps through successful advertising can only enhance the strength of [plaintiffs'] mark and thus enlarge the scope of protection to which it is entitled"). In addition, Brunckhorst distributes numerous point-of-sale materials, as, in turn, do its distributors. The value of the tradename has also been recognized outside of the food products field, as evidenced by the interest of Grolsch Importers in entering a joint venture with Brunckhorst to produce and sell a Boar's Head brand beer, as well as by the interest of Road Champs, Inc. in producing a toy truck with the Boar's Head name and logo on the side. The commercial interest in plaintiffs' toy trucks underlines the success of plaintiffs in bringing their name and logo to the public's attention through the consistent and colorful [14] appearance of its delivery vans, which are mobile advertisements throughout plaintiffs' area of distribution. Brunckhorst has significant sales of Boar's Head Products nationally and in the geographic areas where defendants sell the Boar's Head Beer. *W.W.W. Pharmaceutical,* 984 F.2d at 567.[15] This evidence of distinctiveness plus extensive display throughout the relevant marketplace make it likely that plaintiffs will be able to establish at trial that the Boar's Head Marks have secondary meaning.

■ Finding a secondary meaning is, however, also not the end of the inquiry. The underlying question is whether plaintiffs' marks have enough strength to exclude defendants. In this connection, extensive use by another party or parties of a mark can "weigh against a finding that a trade name is strong." *W.W.W. Pharmaceutical,* 984 F.2d at 573.

Defendants do not present evidence of any extensive use of plaintiffs' logo and mark, but they do note the use of the phrase "Boar's Head" by a number of restaurants, a liquor store, a theater, the operator of a balloon ride, the manufacturer of a now-discontinued wine, and by a small brewery in Maine. And, of course, deli customers and beer drinkers who know their Shakespeare, may be familiar with the name of Falstaff's local in Eastcheap, the Boar's Head Tavern.[16]

These are, however, local, geographically, economically, and temporally limited uses of the phrase, particularly when compared with the breadth and depth geographically, temporally, and economically of plaintiffs' use. Moreover, the use is confined to particular premises and products, remote from those that plaintiffs deal with. No one has chal-

---

**14.** As noted below, the highly visible red and contrasting black of plaintiffs' trucks while apparently not protected by the law of trademark or trade dress nevertheless has some bearing on the issue of likely confusion. This is so because defendants' use of their generic or descriptive "Red Beer" mark together with plaintiffs' Boar's Head Logo not only "describes" a type of beer but also "suggests" plaintiffs' use of the color red on its trucks and in its advertising.

**15.** Defendants' reliance on *W.W.W. Pharmaceutical* for the proposition that the Boar's Head Marks are weak, is misplaced. There, the Court of Appeals held that the mark "Sportstick" for a lip balm was a weak mark since the product had had only limited success since its introduction and the evidence "indicate[d] a low national recognition." 984 F.2d at 573. In contrast, the evidence here indicates a strong national presence for the Boar's Head Marks.

**16.** The tavern appears to have been a wine bar to judge from Falstaff's cry: "Give me a cup of sack [sherry]: —I am a rogue if I drunk to-day." William Shakespeare, *Henry IV (Part I),* Act II, Scene iv. And see Prince Hal's: "Score a pint of bastard [a sweet Spanish wine] in the Half–Moon." *Id.*

lenged the strength of plaintiffs' marks in their own present product line. With the exception of a few restaurants, the conjunction of the name and image of the boar's head in plaintiffs' marks appears unique.[17] As a result, it appears likely that a factfinder will not be persuaded on the trial of this issue that the strength of plaintiffs' mark is substantially undercut by third-party use.

### Similarity of the Marks

■ Under this prong of the inquiry, the Court must consider whether the similarity of the marks is likely to provoke confusion among potential customers. *W.W.W. Pharmaceutical,* 984 F.2d at 573. What is at issue is the general impression created by the marks on the public, considering such factors as the products' sizes, logos, typefaces, and package designs and colors. *Id.*

■ The Boar's Head Marks and the marks used on Boar's Head Beer have a number of similarities. Both marks employ the words, "Boar's Head." Both marks also have an image of a boar's head adjoining the words "Boar's Head": in the case of plaintiffs' products, a gold boar's head, facing right, inside an oval on a red and black background; defendants' product, a gold and black boar's head, facing left, appears inside a circle on a red and green background.[18] The color of the background of defendants' logo is the identical shade of red as that used by plaintiffs, both in their labels and on their red, black, and gold trucks. Both marks generally employ similar typefaces (although

plaintiffs on occasion employ a Germanic-type face), and the words "Boar's Head" on both marks are centered either directly above or below the logos.

Similarity between the marks is also not in itself dispositive. The issue is whether the "impression which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trademark." *McGregor–Doniger,* 599 F.2d at 1134. The combination of factors noted above produces an impression of similar source which is not entirely dispelled by the fact that the Boar's Head Beer label includes in white and gold the "Weinhard's" trade name.[19] *Cf. Merriam–Webster, Inc. v. Random House,* 32 U.S.P.Q.2d 1010, 1014, 35 F.3d 65, 71 (2d Cir.1994); *see also W.W.W. Pharmaceutical,* 984 F.2d at 573.[20] The color contrast between the white print for the words "BOAR'S HEAD" and the kelly green background makes these words much more prominent and visible on the label than the world "Weinhard's" (printed in white and gold against a golden red), that is, the centered kelly green Boar's Head logo and legend grab the eye of the beholder whose hand grabs the bottle. The fact that the producers of the two products both bear Germanic names, Brunckhorst and Weinhard's, further adds to a likelihood of confusion.

### Proximity of the Products

■ This factor addresses the competitive posture of the products *vis à vis* each

---

17. The few uses of the picture of a boar's head in conjunction with the words "Boar's Head" are on inns and restaurants, not on products offered for sale in interstate commerce. Moreover, the boar's head logos used by these establishments do not resemble in appearance the boar's head logo used by plaintiffs. As noted in the next section, defendants' use of a boar's head in a circular logo, the shape of the boar's head, and the use of the words "Boar's Head" directly abutting the logo, all in a way that is remarkably similar to plaintiffs' use, appears unique.

18. A close observer will detect that plaintiffs' boar has its ears laid back while defendants' boar's ears are in an alert position, pointing forward.

19. The bottle caps for the Boar's Head Beer make no reference to Weinhard but simply identify the product as Boar's Head Red.

20. Defendants' reliance on *Merriam–Webster,* 32 U.S.P.Q.2d at 1014–15, 35 F.3d at 71–72, for the proposition that similarity between the products here at issue is lacking is misplaced. There, what distinguished the two products was "[t]he conspicuous use of very different logos and of the names of the publishers" and "[w]ith regard to the logos, [plaintiff's] cover jacket is dominated by its "bulls eye," while [defendant's] has the utterly dissimilar "house" logo." *Id.* at 1014, 35 F.3d at 71. Moreover, the color scheme chosen by each party for its product, red, "is standard for dictionaries." *Id.* Here, however, both products are dominated by the boar's head logo in the center abutting the words "boar's head" with a similar color scheme, which has not been shown to be standard.

other in order to determine "whether it is likely that customers mistakenly will assume that [defendants' goods] somehow are associated with [plaintiffs] or are made by [plaintiffs]." *Centaur Communications,* 830 F.2d at 1226 (citation omitted). In assessing competitive proximity, the Court should consider, among other things, the extent to which the products differ in content, geographic distribution, market position, and audience appeal. *W.W.W. Pharmaceutical,* 984 F.2d at 573.

■ Both plaintiffs' and defendants' products are sold through the same channels of trade and in the same geographic area. In fact, the products are often sold in the same stores, next to each other, graphically illustrating a situation of competitive proximity. *W.W.W. Pharmaceutical,* 984 F.2d at 573. Also bearing on the issue of competitive proximity is the complimentary use of the products. Beer is regularly consumed with deli products of the type sold by plaintiffs. *See, e.g., In re Martin's Famous Pastry Shoppe, Inc.,* 748 F.2d 1565, 1567 (Fed.Cir. 1984) (bread and cheese are proximately competitive since they are often used together); *Bongrain Int'l (American) Corp. v. Moquet, Ltd.,* 230 U.S.P.Q. 626, 628 (T.T.A.B. 1986) (cheese and wine). *But see Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981) (crackers and tortilla chips not proximately competitive). To illustrate the obvious, it is more likely that consumers will assume that the beer carrying the Boar's Head name is produced by the same manufacturer that produces Boar's Head food products than would be the case where the Boar's Head name were used for a champagne or gin.[21] Plaintiffs' point-of-sale advertising and promotional materials further demonstrate the close proximity of the products, for example, its use of beer mugs and steins bearing the Boar's Head Marks to sell their food products.

The fact that defendants' product is not a meat or cheese product does not eliminate the likelihood of confusion. Both products are higher quality food products sold in delicatessens and other food outlets. It consti-

tutes no great stretch of the imagination for consumers who use Boar's Head food products to assume that plaintiffs decided to launch a beer with the Boar's Head name.

Defendants argue nevertheless that "beer is not sausage" (*"Bier ist nicht wurst"*), that is, that the products are so different that likelihood of confusion is unlikely. However, consumers are as aware as businessmen that companies frequently cross product lines and manufacture products in different facilities which complement each other in the market place. *Centaur Communications,* 830 F.2d at 1226. Competitive proximity exists since consumers are likely to assume that Boar's Head Beer is a new or another product sold by plaintiffs, particularly given defendants' expressed intent that their product be referred to as "Boar's Head Red" by its consumers, the color red being a means by which plaintiffs have attracted consumers' eyes to their products. .

Further, even if consumers do not consciously conclude or speculate that defendants' product is affiliated with plaintiffs, there is the likelihood that consumers will be attracted to defendants' product by the "good will" and positive image established by plaintiffs' Boar's Head Marks. The trademark laws are designed to avoid this type of subtle confusion, even if it might be dispelled by the consumer herself upon further investigation. *Stern's Miracle–Gro,* 823 F.Supp. at 1090. In sum, the competitive proximity of the parties' products weighs in favor of a finding of a likelihood of consumer confusion on this score.

### Bridging the Gap

■ Under this factor one considers whether the senior user of the mark is likely to enter the market in which the junior user is operating, that is, bridge the gap. *Centaur Communications,* 830 F.2d at 1227. The factor is significant because trademark law protects "the senior user's interest in being able to enter a related field at some future time." *Scarves by Vera, Inc. v. Todo*

---

**21.** In fact, the boar's head image is used on a brand of gin with no noticeable confusion among

consumers.

*Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir. 1976).

■ At first blush, the fact that plaintiffs have in the past rejected an opportunity to expand into defendants' product line would seem to weigh against a likelihood of confusion. However, on further reflection, the fact that Grolsch made the proposal and that plaintiffs gave it serious consideration suggests that there continues to exist an impetus to move from one product line into the other. That third parties have continued to express a desire to draw plaintiffs into a joint venture or licensing arrangement of a Boar's Head beer is also evidence that the gap may, in the future, be bridged by plaintiffs.

■ The absence of a current intent to bridge the gap is not determinative. In a given case, likelihood of confusion may be established even in the absence of a likelihood that the gap will ever be bridged. *McGregor–Doniger*, 599 F.2d at 1136. In such a case, consumers may well assume "in this era of corporate diversification, that the parties are related companies." *Lambda Electronics Corp. v. Lambda Tech., Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y.1981). Some consumers are likely to conclude, because of the similarity of the products and marks detailed earlier, that Boar's Head food products and Boar's Head Beer are manufactured by the same company. Accordingly, this factor as well weighs in favor of a likelihood of confusion.

## Actual Confusion

■ Evidence of actual confusion is a strong indication that a likelihood of confusion exists, although actual confusion need not be shown to prove a likelihood of confusion under the Lanham Act. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 170–71 (2d Cir.1991); *Centaur Communica-*

*tions*, 830 F.2d at 1227; *Lois Sportswear*, 799 F.2d at 875. Moreover, the absence of actual confusion is less significant when, as is the case here, the period in which the two products have coexisted is a short one. *See, e.g., Centaur Communications*, 830 F.2d at 1227 (four months).

■ Plaintiffs have adduced some evidence of actual confusion. Plaintiffs' affiants have each described anecdotally instances in which purchasers of Boar's Head food products believed that Boar's Head Beer came from the same source as Boar's Head food products. Even a fairly sophisticated business person who worked as a Boar's Head merchandiser initially believed that Boar's Head Beer was marketed and sold by plaintiffs. Such anecdotal evidence even from interested sources has been considered previously within this Circuit by courts addressing this factor. *See, e.g., Centaur Communications*, 830 F.2d at 1227 (citing cases).[22]

Defendants contend that the Johnson Survey disproves the likelihood of any confusion in the marketplace. The survey itself, however, presents methodological problems. One of the questions asked of survey respondents was whether they "have a belief about who or what company makes or manufactures Boar's Head Red Beer." This question confronts only the issue of whether there is conscious confusion. It fails to deal with more subjective and inchoate confusion as to whether the two products are related. *Johnson & Johnson v. E.I. DuPont de Nemours & Co.*, 181 U.S.P.Q. 790, 791 (T.T.A.B.1974). Another question asked of survey respondents was whether they "believe that the company that makes or puts out Boar's Head Red Beer makes or puts out any other products." The question how single-minded many beer consumers believe their brewer may be deals also with conscious confusion

---

**22.** As defendants argue, the strength of the actual confusion evidence is diminished to the extent that it is presented in hearsay form. *See, e.g., Lobo Enters., Inc. v. Tunnel, Inc.*, 693 F.Supp. 71, 77 (S.D.N.Y.1988). However, the evidence of actual confusion adduced here through the affidavits of plaintiffs' affiants is not hearsay to the extent that they evidence or otherwise express customers' then-existing state of mind, to wit., their confusion as to the source of Boar's Head

Beer. *See, e.g., Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977). Defendants, by declining a hearing at which they might have cross-examined the affiants, are in no position to object to the fact that the affidavits themselves are hearsay. Nevertheless, the affiants' evidence must be discounted to some extent because of their affiliation with plaintiffs.

and in fact suggests another type of injury to plaintiffs which may result from such confusion, namely, the erroneous impression that plaintiffs are spreading themselves too thin, as was the case (some people in Brooklyn think) when Nathan's moved to Times Square. *See Centaur Communications*, 830 F.2d at 1226; *see also Fleischmann Distilling Corp. v. Maier Brewing Company*, 314 F.2d 149, 155 (9th Cir.1963).

In all events, the results of the survey hurt as much as help defendants' position. Three respondents out of the 600 in the National Study identified the maker of Boar's Head Beer as the Boar's Head Meat/deli company. Since the National Study did not give the respondents a choice of companies but, rather, left it for the respondents to fill in the blank, another 10 identified the maker as Boar's Head, which given the strength of plaintiffs' mark likely means plaintiffs here. *See, e.g., James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 278 (7th Cir. 1976) (response "Beefeater Gin" and "Beefeater" referred to same company). The 13 respondents who picked either Boar's Head or the Boar's Head Meat/deli company comprise 34% of all respondents who consciously formed a belief as to the identity of the manufacturer based on the words "Boar's Head," which is a significant number of confused consumers. *See, e.g., James Burrough*, 540 F.2d at 279 ("We cannot agree that 15% is 'small'"); *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803, 817 ("11% of a figure in the millions is a high number"), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969); *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp.

198, 219 (D.Md.1988) (16%); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1277–78 (S.D.N.Y.1986) (25%).[23]

Further, while 32% of those respondents who thought about it believed that the manufacturer of Boar's Head Beer made additional beers, 15% of those who thought about it believed that the brewer made deli products. Since the respondents were only told the name of the product, which is beer, the fact that 15% of the respondents believed that the manufacturer of Boar's Head Beer made deli products is strong evidence of likelihood of confusion.[24]

Defendants also present a Market Study to demonstrate that consumers are not confused as to the source of Boar's Head Beer, citing *Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir.1983) (7.6% of consumers confused weighs against infringement); *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 697 (1st Cir.1979) (7.2%); *Scott v. Mego Int'l, Inc.*, 519 F.Supp. 1118, 1130 n. 11 (D.Minn.1981) (6%).

The National Study, however, as a random or probability sampling, is entitled to more weight than the Market Study which, as a face-to-face mall intercept, is not random. *See 4 McCarthy on Trademarks* § 32.48[2], at 32–205 to 32–209; *see also Calvin Klein Co. v. Farah Mfg. Co.*, 229 U.S.P.Q. 795, 1985 WL 3953 (S.D.N.Y.) (an intercept survey is less accurate than a probability survey because the results cannot be statistically projected to the entire population).

**23.** Defendants note that only 2.2% of all respondents mistakenly selected Boar's Head Meat/deli company or Boar's Head as the producer of Boar's Head Beer. Of course, people buy a particular brand of beer for many reasons besides brand name, including price, placement, or what's available. The significant issue here is how many of those who are influenced by the Boar's Head Mark in making up their mind are misled by confusion as to the identity of the brewer. Of those who formed a belief about the identity of the brewer based on the name, 34% believed that either Boar's Head or Boar's Head Meat/deli company made the beer. Defendants use the same mistaken methodology in reaching other conclusions, for instance that only 3.2% of respondents link Boar's Head Beer with deli

products. Reading the data correctly yields a linkage of 15%.

**24.** In fact, of the 114 respondents who believed that the manufacturer of Boar's Head Beer made another product, 48 respondents had in fact no idea what that other product was. Accordingly, it is more proper to consider the 17 respondents who believed that such other product was deli products as a sample of the 66 respondents who both believed that the Boar's Head Beer producer made another product and had an idea what that product was. Thus, the meaningful percentage of individuals who believed that the manufacturer of Boar's Head Beer also made deli products is 26%, or over one-quarter.

The Market Study has another significant problem that decreases its weight, namely, the advertisement that the intercepted respondents were shown before being questioned. Since the advertisement prominently displayed a pilsner glass filled with beer, it is no surprise that the respondents overwhelmingly associated the producer of Boar's Head Beer with other beer products. Moreover, the advertisement shown to the mall intercepts explicitly stated that "Boar's Head Red ... [was] from Weinhard's." It is, accordingly, not surprising that the respondents overwhelmingly identified Boar's Head Beer as a Weinhard product. Even with such prompting, only 38% of the respondents had a belief as to the manufacturer of the beer. (How sober was the other 62% is not an entirely frivolous question.) Moreover, of the 38%, 4% still indicated that they thought the producer was Boar's Head. The advertisement shown in the survey is only one of many types of advertisements used by defendants. Other advertising includes a billboard on which the words "Boar's Head" are prominently displayed, with the Weinhard's name detectable only on a picture of the beer bottle of Boar's Head Beer. Radio advertisements prominently mention the Boar's Head name, while referring only in passing to Weinhard. Only one of the promotional materials produced by defendants refers to the beer as Weinhard's Red, as opposed to Boar's Head Red.

Finally, given the recent entry of Boar's Head Beer onto the market, what evidence there is of actual confusion weighs more heavily than would be the case if the products had existed side by side for some time. It would be unfair to penalize plaintiffs by forcing them to wait for more evidence of actual confusion instead of acting to protect their trademark rights before serious damage has occurred. *Lois Sportswear,* 799 F.2d at 875. The evidence adduced thus far weighs in favor of a finding of likelihood of confusion.

### Good Faith

In assessing good faith, the Court must consider " 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and good will and any confusion between his and the [plaintiff's] product." *W.W.W. Pharmaceutical,* 984 F.2d at 575 (citation omitted). A defendant's good faith, however, does not necessarily absolve it of responsibility for the confusion it had accidentally created, *Centaur Communications,* 830 F.2d at 1228, and "intent is largely irrelevant in determining if consumers likely will be confused as to the source." *Lois Sportswear,* 799 F.2d at 875.

When a company appropriates a mark that is well-known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the good will and reputation of the mark, as well as any confusion that might result as to the common origin between that mark and the senior user's product. *Stern's Miracle–Gro v. Shark Products,* 823 F.Supp. 1077, 1087 (S.D.N.Y.1993) (citing cases). Given the commercial strength of Boar's Head Products, it is no great stretch to infer that defendants knew of the existence of the Boar's Head Marks when adopting its marks for Boar's Head Beer and deliberately expanded the use of their Blue Boar Mark in a manner productive of confusion to benefit from plaintiffs' good will.

Good faith can be found where a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search, or has relied on the advice of counsel. *W.W.W. Pharmaceutical,* 984 F.2d at 575. Boar's Head Beer is an expansion of defendants' other products in the Weinhard family and can be looked on as capitalizing on the good will developed by other Weinhard beers sold under the Blue Boar Mark, a federally registered and incontestable trademark. Defendants have proffered a legitimate reason for the inclusion of the words "Boar's Head" on the label, namely, a desire to sell a "red beer" under the catchy name "Boar's Head Red." On balance, however, it appears likely that plaintiffs will prevail in persuading a finder of fact that this legitimate reason was either pretextual or existed alongside an illegitimate objective, namely, the objective of capitalizing on plaintiffs' good will.

## Quality of Defendants' Product

■ If an infringing product is of inferior quality, the senior user is entitled to protect "the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user." *Scarves by Vera*, 544 F.2d at 1172. Here, the evidence produced indicates that defendants' product, Boar's Head Beer, is a high quality product targeted to the specialty or premium beer market, a point conceded by plaintiffs. As such, the quality of defendants' product does not seem to impair plaintiffs' good will.

■ Plaintiffs Boar's Head food products are, however, also of relatively high quality. "The lack of marked difference in quality between goods supports the inference that they emanate from the same source." *Centaur Communications*, 830 F.2d at 1228. Thus, some consumers who are aware of quality will in all likelihood assume that a quality beer bearing something remarkably like plaintiffs' marks is in fact plaintiffs' product. *Lois Sportswear*, 799 F.2d at 875. The fact that defendants have produced a high quality product bearing plaintiffs' marks "suggests that the possibility of their profiting from [plaintiffs'] good will is still likely." *Id.*

## Sophistication of Consumers

Likelihood of confusion may also be assessed by considering the level of sophistication of the relevant purchasers. *W.W.W. Pharmaceutical*, 984 F.2d at 575. Thus, the Court must consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *McGregor–Doniger*, 599 F.2d at 1137. And it has been said with the somewhat heavy-handed common sense that judges typically bring to matters of this sort that "[t]he greater the value of an article the more

careful the typical consumer can be expected to be." *Id.*

There are two levels of potential confusion here: consumer confusion and retailer confusion. With respect to the latter, "[r]etailers are assumed to be more sophisticated buyers and thus less prone to confusion." *W.W.W. Pharmaceutical*, 984 F.2d at 576. However, with respect to consumers, the products at issue here, while potentially high in quality, are low cost food and beverage items "not conducive to the exercise of careful selectivity by purchasers." *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir.1979). While there is something to defendants' assertion that consumers of premium beers are more sophisticated than consumers of, say, Budweiser [25], courts analyzing consumers of food products have generally found them to leave their sophistication at home, even in choosing among high quality products. *See, e.g., Martin's Famous Pastry Shoppe*, 748 F.2d at 1567 ("Bread and cheese are staple, relatively inexpensive comestibles, subject to frequent replacement. Purchasers of such products have long been held to a lesser standard of purchasing care.").

The factors discussed above, considered individually and together, establish that it is more likely than not that a substantial number of consumers will be confused as to the source of Boar's Head Beer and assume that it emanates from the same source as Boar's Head food products. While the likelihood of confusion issue is always one that is dependent on the peculiar set of facts presented, *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 253 (2d Cir.1982), the strength of the plaintiffs' marks, the secondary meaning that has developed over the past eight decades, the similarity of the marks, and the evidence of actual confusion as well as other factors establish a likelihood of success on the merits.

■ This conclusion, however, does not compel a finding of irreparable injury. *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 737 (2d Cir.1991).[26]

---

**25.** Except, of course, in the Czech Republic where Budweiser is a premium beer.

**26.** Irreparable injury can be assumed from a probability of success on the merits where there

is a high probability of a likelihood of confusion, *Church of Scientology*, 794 F.2d at 41, or a clearer showing of bad faith than is made out here. *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 894 (2d Cir.1982).

The Lanham Act protects the plaintiff against three types of injury: loss of patronage, loss of reputation, and limitation on business expansion. *Vitarroz*, 644 F.2d at 967. While injury of these kinds "might be inevitable when the marks and products are practically identical and the products are interchangeable for all ... significant uses," where the products "differ in non-trivial respects and share only some areas of competing use," the question of injury may be "close and vexing." *Id.* at 967–68.

■■■ In such a situation, the consideration of the *Polaroid* factors should be supplemented by balancing the conflicting equities, including the nature of the senior user's priority, the senior user's delay in asserting its claim, and the harm to the junior user against the benefit to the senior user that would result from the requested injunction. *Vitarroz*, 644 F.2d at 966–67 (citations omitted); *see also W.W.W. Pharmaceutical*, 984 F.2d at 576; *Jim Beam*, 937 F.2d at 737.

■■■ The first two of these factors weighs in favor of plaintiffs, plaintiffs having used the Boar's Head Marks for over 80 years and having acted speedily to preserve their rights.[27] The third factor, however, is more problematic. Defendants have established some significant injury that will accrue through the issuance of a preliminary injunction barring any further sales of their product. Defendants would have to go through the process of obtaining federal and state approvals for new labels, a process that takes 60 days. Since defendants' freshness standards require that beer be sold to the consumer within 120 days of brewing, defendants would be forced to destroy at least some of the Boar's Head Beer now in the marketplace. Further, old labels would have to be stripped by hand, a process that would

cost more than the price of the beer. Defendants' estimate this expense at more than $6 million. In the face of this, plaintiffs conceded on oral argument that they are not entitled to enjoin sales of products already labeled or that will be ready for labeling in the next six months. Accordingly, the injunction granted here enjoins use of the name "Boar's Head" on the beer after six months from the date hereof. *See, e.g., W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868 (2d Cir.1966) (defendant given time to market its available supply of articles already marked with an infringing trademark).

Defendants also note that they have spent over $4 million on advertising and promotions to build its brand name in the Boar's Head Beer. This expenditure, however, has only been in one region of the country. Close to $3 million of this figure has, moreover, been devoted to point-of-sale advertising, that is, a substantial portion of the advertising has been directed to selling the beer rather than building future good will.[28] Defendants' concern that wholesalers who currently carry Boar's Head Beer will instead favor brands of other brewers in this segment while defendants are forced to relabel and seek new regulatory approval for their labels, will be mitigated by the prospective nature of the preliminary injunction.

Finally, the only phrase being enjoined is "Boar's Head." Defendants may continue to market the beer as they do their other products, using the words "Blue Boar" below the Blue Boar Mark and the word "Weinhard's" on the bottle cap. Defendants are also free to keep the same label and label colors, albeit without the words "Boar's Head."

On the other side, the irreparable injury to plaintiffs' rights under the Lanham Act pending trial of this action is substantial.[29]

---

**27.** Plaintiffs' delay in bringing its motion is credibly explained by an attempt to settle with defendants, which does not eliminate the need for preliminary relief where settlement efforts have been unsuccessful. *See, e.g., Comic Strip Inc. v. Fox Television Stations, Inc.*, 710 F.Supp. 976, 981 (S.D.N.Y.1989).

**28.** Defendants' reliance on a line from *Vitarroz*, 644 F.2d at 969 ("any injury to [plaintiff's] interest is far outweighed by [defendant's] interest in retaining the good will developed as a result of

its multi-million dollar investment"), is misplaced. There the senior user had no interest in bridging the gap. The junior user had made reasonable efforts to discover all prior uses of the mark and overlooked the plaintiffs, in reliance on which it spent millions of dollars building a brand name.

**29.** While this case might be tried on the merits in six months, defendants themselves have established the need for another six months' lead time

While the sale of defendants' product under plaintiffs' mark may not impair the reputation enjoyed by the Boar's Head Marks, any failure to police and enforce the marks will result in dilution of its marks and enable subsequent, less reputable manufacturers to appropriate and injure plaintiffs' reputation and good will, now associated with a weaker mark. *See, e.g., Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987). The use of the mark BOAR'S HEAD BRAND combined with the high quality of plaintiffs' Boar's Head Products provides a strong mark, and consumers can rely upon any product that says "Boar's Head" to be a good product. It is this brand strength that is threatened by a dilution of the mark and defendants' piggybacking on plaintiffs' pre-existing good will. *Mobil Oil*, 818 F.2d at 259 (" 'Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well-known mark.' ") (citation omitted).

The irreparable injury created by the infringement here at issue is plaintiffs' loss of control over their marks. *Church of Scientology*, 794 F.2d at 43. Plaintiffs' marks have acquired good will over their eight decade use, and defendants' likely appropriation of that mark risks injury to plaintiffs' marks whether defendants' use is on an inferior product or whether defendants' use diminishes plaintiffs' sales:

> [A merchant's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask.

*Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928) (Hand, J.); *see also Lois Sportswear*, 799 F.2d at 876 ("[A]ppellees sales will be affected adversely by these buyers' ultimate realization that the pattern is no

to comply with a judgment, not to mention the

longer exclusive."). *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987).

In addition, there is the incidental effect of continuing consumer confusion. Those who are confused, once enlightened, are as likely to blame plaintiffs as defendants for the deception. Some consumers may well feel that Brunckhorst should stick to its wurst and inappropriately blame plaintiffs for overexpansion.

Defendants' expenditure of advertising dollars does not trump plaintiffs' rights. Given the strength of the Boar's Head Marks and the Boar's Head name, it is unlikely that defendants were unaware of plaintiffs' prior use at the time they decided to adopt the Boar's Head name for their beer. Defendants' expenditure of advertising dollars was at their own risk. Six months is sufficient time for defendants to recoup at least a substantial part of their investment in advertising and design and obtain approval of a new label.

Accordingly, for the reasons set forth herein, plaintiffs' motion for a preliminary injunction is granted.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

## PRELIMINARY INJUNCTION ORDER

For the reasons stated and upon the findings of fact and conclusions of law set forth in this Court's Memorandum and Order of even date, it is hereby

ORDERED that defendants, G. Heileman Brewing Co., Inc., and Heileman Holding Company, their agents, servants, attorneys, employees, and all those in active concert and participation with them be enjoined, pending trial of this matter, from using the name "Boar's Head" in conjunction with the selling, marketing, advertising or offering of any beer or other alcoholic malt beverage product after six months from the date of this order; and it is further

time needed for appellate review.

ORDERED that the effectiveness of this preliminary injunction is conditioned upon plaintiffs posting a bond in the amount of $25,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.