**GENERAL CIGAR CO., INC., Plaintiff,**

v.

**G.D.M. INC. d/b/a Global Direct Marketing and Raymond Parker, Defendants.**

**No. 97 Civ. 7783(RWS).**

United States District Court,
S.D. New York.

Dec. 18, 1997.

Morgan & Finnegan, New York City (Harry C. Marcus, Janet Dore, of counsel), for Plaintiff.

Charles H. Knull, Larry B. Miller, New York City, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff General Cigar Co. Inc., ("General Cigar") has filed the instant motion for *inter alia,* a preliminary injunction to enjoin defendant G.D.M. Inc. ("GDM") from using the trademark COHIBA for premium cigars. An expensive cigar is a symbol of influence, sophistication and power,[1] the gift of heads of state,[2] which has found an increasing popularity with new, young and affluent smokers. COHIBA is variously a term for tobacco in an ancient and forgotten tongue, a sometime geographic destination, and a trademark owned by General Cigar Co. Inc. ("General Cigar"). It is in this latter capacity that COHIBA arises as the subject of this litigation. In brief, GDM, an upstart company, began illegal use of General Cigar's established COHIBA trademark, and has attempted to defend its actions, in part, by asserting the trademark rights of the Cuban dictator, Fidel Castro. As GDM will learn from the outcome set forth below, those who rely on the reputation of Castro's cigar to protect themselves from infringement actions will find their arguments going up in smoke.

### Parties

Plaintiff General Cigar is a Delaware corporation with its principal place of business at 320 West Newberry Road, Bloomfield, Connecticut. General Cigar has been engaged in the manufacture, sale and distribution of cigars and related products in the

---

1. Television commercial for Richard Lewisohn, Candidate for Controller, 1977 (showing only back of candidate's chair, protruding cigar and cigar smoke).

2. Interview with Oscar Boruchin, Proprietor of Mike's Cigars, *Cigar Aficianado* (March/April 1997) (describing Fidel Castro's gift of COHIBA cigars to visiting dignitaries).

United States, in the Dominican Republic and in other countries for many years.

Defendant GDM is a New York corporation with offices at 599 Lexington Avenue, New York, New York. GDM has been engaged in the importation, advertising and distribution of cigars in New York and elsewhere since July, 1997.

Defendant Raymond Parker ("Parker") is the vice-president and a principal owner of GDM and has offices at 27 West 20th Street, New York, New York.

Defendant Glen Miller ("Miller") is president and principal shareholder of the corporate defendant.

### Prior Proceedings

General Cigar filed this action on October 21, 1997, bringing claims against GDM for trademark infringement in violation of § 32 of the United States Trademark Act, (the "Trademark Act") 15 U.S.C. § 1114, unlawful importation and sales of unlawfully imported goods in violation of the United States Tariff Act of 1930, 19 U.S.C. § 1526, and in violation of §§ 42 and 43(b) of the Trademark Act, 15 U.S.C. §§ 1124, 1125(b), false representations, false advertising and unfair competition in violation of § 43(a) of the Trademark Act, 15 U.S.C. § 1125(a), deceptive trade practices in violation of N.Y.Gen.Bus. Law § 349, false advertising in violation of N.Y.Gen.Bus .Law § 350, injury to reputation in violation of N.Y.Gen.Bus.Law § 360(a), common law trademark infringement and unfair competition and tortious interference with prospective business advantage.

On October 29, 1997, General Cigar brought the instant preliminary injunction action by order to show cause. General Cigar seeks to enjoin GDM from, *inter alia:* (a) using the mark COHIBA or any other mark confusingly similar to General Cigar's COHIBA mark to identify services constituting or relating to cigars; (b) making any false or misleading statement about General Cigar's COHIBA cigars, which misrepresents the nature, characteristics or qualities of General Cigar's goods or trademark; (c) importing COHIBA cigars without the consent or authorization of General Cigar; and (d) selling, distributing, marketing, or advertising COHIBA cigars which have been imported into this country without the consent or authorization of General Cigar.

General cigar also seeks an injunction requiring GDM to deliver all cigars or other merchandise which refer to the COHIBA mark in connection with cigars or related goods, to inform their customers that they cannot sell COHIBA cigars in the United States, and that all their COHIBA cigar sales have been unauthorized, and to recall all cigars which GDM has distributed or sold which bear the infringing COHIBA mark.

A factual hearing was held on Friday, November 14 and Monday, November 17, with final arguments heard on Monday, December 1, 1997.

### Findings of Fact

### Use of COHIBA Mark by General Cigar

In late 1977, Culbro, the former parent company of General Cigar, decided to adopt COHIBA as a new trademark for one of its premium brand cigars. Notes from internal Culbro meetings dated December 15 and January 2, 1977 state that the word "cohiba" was derived from the Spanish verb "cohibir", which means to prohibit or restrain. Another set of notes dated December 12, 1977 made by Charles H. Sparks, the trademark custodian for Culbro, state that COHIBA was the name of a personal brand of cigar smoked by Castro. These notes indicate that the CEO of Culbro rejected the idea of a trademark search for COHIBA, and was satisfied with beginning use of the mark on cigars. The notes conclude by stating that "a grain label (will be) made up for the first three marks and (Culbro will) at least have a first use made of the marks in commerce."

Culbro registered the COHIBA mark in 1978. In its application for registration, Culbro stated that the mark was first used on cigars in interstate commerce on February 13, 1978, and "is now in such use in commerce." The mark at that time consisted merely of the word COHIBA, without any specific design or presentation of the letters. In February and June of 1978, Culbro sold cigars labeled with the COHIBA mark to Rubovits Cigars, Inc., Chicago, Illinois. In

March and April of 1978, Culbro sold COHI-BA cigars to Cigars Santa Clara Ltd., New York, New York. These retailers sold the COHIBA cigars to the public. During this period, COHIBA Cigars were marketed in boxes of 50 cigars each, no example of which has survived.

On July 25, 1978, the Patent and Trademark Office ("PTO") sent an inquiry to Culbro regarding whether the term Cohiba had any meaning or significance in the relevant trade or industry, or in the English language. The PTO also inquired regarding compliance with labels using the trademark. On January 3, 1979, Culbro sent a response to the PTO stating "To the best of applicant's knowledge, the word 'cohiba' has no English translation or any meaning or significance in the relevant trade or industry." The response also stated that "applicant is and has been in compliance with the Federal Regulations regarding labeling of products bearing the mark COHIBA", and enclosed a label specimen.

On March 30, 1979, the PTO again contacted Culbro, raising the issue that Cohiba is a geographical tobacco growing region of Cuba, and therefore the name should be denied registration as merely descriptive or as deceptively misdescriptive, pursuant to § 2 of the Trademark Act. Culbro responded by contending that registration should not be denied because the cigars did not originate in Cuba, and cigar consumers in the United States were sufficiently ignorant of the Cohiba region in Cuba that use of the term was arbitrary or fictitious.

On February 17, 1981, the PTO issued registration of the COHIBA mark, No. 1,147,309. This registration was assigned by Culbro to its subsidiary, General Cigar on January 13, 1987.

An internal memorandum dated March 2, 1981, informed Edgar M. Cullman, Jr. ("Cullman"), the CEO of Culbro, that the trademark registration had matured. The memorandum also stated:

> This trademark is being used in conjunction with periodic shipments, but to gain full protection of this trademark against use by others, shipments of cigars in interstate commerce should be made with the

permanent-type of packaging as early as practical.

General Cigar was unable to produce documents demonstrating any sales of COHIBA cigars in 1980 or 1981. Another internal memorandum dated February 18, 1982 stated:

> We have a registration for that mark issued February 17, 1981, but as yet no commercial use of product ... Normally the Patent & Trademark office would reject the new application on the basis of our registration.... This is a little tricky because of our non-use of the registration on a commercial scale.

General Cigar was unable to produce documents demonstrating commercial use of the mark for the first three quarters of 1982.

At some point in 1982, General Cigar altered the packaging of COHIBA cigars from the original box of 50 to a clear plastic cylindrical package which held an upright bundle of 20 cigars. A label was pasted around the middle of the package with a picture of a monk and an Indian facing one another, separated by an enlarged tobacco leaf and the setting sun. The front of the label bore the legend: "COHIBA ... FLOR FINA DIAZ Y CIA ... 20 CIGARS ... HANDMADE ... IMPORTED." Beneath the wraparound label was another rectangular label stating: "COHIBA No. 2." The back of the label related a short history of COHIBA cigars which began:

> In the year 1496, the first account of tobacco was published by the Spanish monk, Romanus Pane, who sailed with Columbus on his second voyage to America. During his stay in St. Domingo (Hispaniola), he wrote the fascinating story of smoking by the Indian natives who used cured leaves from a strange plant which he named ... COHIBA [...] We have selected St. Domingo (now the Dominican Republic) with its rich tradition to make our COHIBA® ... A HANDMADE CIGAR OF IMPECCABLE QUALITY.

This story of COHIBA cigars is related in a history book possessed by Culbro which was published in 1875. The book also states that

the original name for the tobacco plant given by the Indians of Hispaniola was "cohiba."

### State of the Cigar Market from 1978–1992

According to John R. Geoghegan, vice president of strategic planning and brand development for General Cigar, the market for cigars, including premium cigars, was in a state of steady decline from 1972 until 1992, shrinking by three to six percent per year. In the late seventies to mid eighties, the total number of units imported into the United States was only 70 or 80 million units of premium cigars. In the early 1990's, only an estimated 500,000 men smoked premium cigars in the United States, approximately one half of one percent of the adult male population.

During this period, sales of the COHIBA cigar declined, in part as a reflection of the overall market decline, and in part, according to Geoghegan, due to the failure of the plastic canister package to attract customers. Total volume of sales of COHIBA cigars from 1978 to 1992 amounted to a million and a half cigars, at approximately $2.5 million factory selling price. Invoices indicate shipments of COHIBA cigars for September through December of 1982, and December of 1983, 1984, 1985, 1986 and 1987, but invoices are lacking to demonstrate any shipment or sales in 1988, 1989, 1990 or 1991. General Cigar maintains that this period from 1988 to 1991 represents a temporary hiatus during which General Cigar Staged the relaunching of COHIBA cigars. Geoghegan testified that the relaunching was comprised of three major efforts: the institution of a tobacconist partnership program, an application for a second trademark registration with improved graphics, and a complete change in packaging.

The tobacconist partnership program formed a marketing partnership between General Cigar and premium cigar retailers, initially exclusively with two retailers, Alfred Dunhill, North America Ltd., ("Dunhill"), and Mike's Cigars. Dunhill maintained eleven cigar shops around the country; Mike's Cigars maintained cigar shops in Miami. Both companies conduct an extensive direct mail business for national distribution of the cigars. General Cigar intended to limit the customer base for COHIBA cigars in order to uphold its reputation as a premium cigar. These efforts at relaunching COHIBA appear to have been successful. Mark Perez, ("Perez"), a buyer for the smoker's products division at Dunhill, testified that boxes of repackaged COHIBA cigars would rarely be shelved because they were sold out immediately upon delivery to Dunhill.

The second trademark application was filed on December 30, 1992. This second registration included not only the word CO-HIBA, but specific type-face, in bold, capital letters. On January 5, 1995, General Cigar filed a statement of use with the PTO, indicating that the second COHIBA mark was first used on goods in interstate commerce in December 1992, and was in use at the time of the statement. The registration was issued June 6, 1995, No. 1,898,273.

The new package was a shallow rectangular box which held 25 cigars. A lid was attached to the box by a metal clasp and two metal hinges. On the lower right hand corner of the lid appeared the trademark, CO-HIBA, in bold, capital letters. The inside of the lid bore the same mark, and the words:

> 25 Robusto ... Hecho a Mano ... Made in Santiago, Republica Dominicana.

The front of the box bore the words "25 Robusto ... Hecho a Mano." The back of the box bore the following warning:

> Warning: This Product Produces Chemicals Known To The State of California To Cause Cancer And Birth Defects or Other Reproductive Harm.

The sides of the box bear the legend "25 Robusto ... Hecho a Mano." The bottom of the box bore the inscription:

> 25 Cigars Distributed By Alfred Dunhill of London, Inc.... Handmade in Santiago, Republica Dominicana ... F4S New York, N.Y.

In 1992 General Cigar again altered the packaging of COHIBA cigars, applying a finish to the wooden box used earlier. General Cigar also added a sheer flyleaf on top of the cigars inside the box. The flyleaf bears the mark COHIBA in the same bold capital letters followed by the trademark symbol. The

mark is superimposed over smaller type again telling the legend of COHIBA cigars:

> As early as 1496, the word COHIBA® was used by the natives of Hispaniola (now Santo Domingo) to describe the cured leaves of tobacco they smoked for pleasure and relaxation. While sailing with Christopher Columbus on his second voyage, Romanus Pane, a Spanish monk, wrote of this and gave us the name COHIBA®. The fertile soil and ideal climate of the Dominican Republic, where COHIBA® was first smoked 500 years ago, makes it an ideal source for time tobaccos today.

The rest of the type reiterates the virtues of COHIBA cigars. At the bottom of the fly-leaf in small print are the words: "COHIBA® is a registered trademark of General Cigar Co., Inc." COHIBA cigars themselves bear a banded label which is white bordered in black. Across the center of the label are the bold, capital letters: "COHIBA". The center of the "O" in COHIBA is colored red.

### General Cigar's Advertising Campaign for COHIBA

During the decline of the cigar market, General Cigar did not make a practice of widely advertising COHIBA cigars, or any of its other branded cigars. Instead, General Cigar would provide incentive dollars to its retailer customers to use to develop creative material, fliers and local advertisements. The amount of dollars provided was tied to the percentage of COHIBA cigars purchased, which averaged about $10,000 per year during this slow period. Advertisements in 1985 and 1986 were placed in direct mail catalogs produced by tobacconist Iwan Reis & Co. in Chicago Illinois.

In 1991 and 1992, however, General Cigar began to spend significantly more money as it relaunched COHIBA cigars in its new wooden box, amounting to $50,000 per year. In 1993, shortly after General Cigar's first relaunching of COHIBA cigars, the cigar market began to surge upwards. From 1993 to 1997, total imports of premium cigars are estimated to have been 550 million units, an eight fold increase. As a result of this upward swing, General Cigar again relaunched COHIBA in 1997 in the finished wooden box

with fly-leaf, and also increased spending to $3 million for 1997 alone for advertising in such magazines as Vanity Fair, the New York Times Magazine, Cigar Aficionado, the New Yorker, GQ and U.S. News and World Report, as well as for promotional parties in New York, and Miami. From July 1997 to the present, General Cigar sold 750,000 COHIBA cigars.

### Use of COHIBA Mark by GDM

According to the testimony of Raymond Parker, ("Parker"), Vice President of GDM, GDM began importing its COHIBA cigars in May 1997 from the Monte Cristi de Tobacos c.x.a. factory in Santiago, Dominican Republic.

General Cigar first learned of Monte Cristi's imports in 1995. Since that time, it has cooperated with its main competitor, Consolidated Cigar, ("Consolidated"), in a lawsuit brought by Consolidated against Monte Cristi in the Dominican Republic. General Cigar has also instructed its employees to immediately notify its in-house legal counsel if any cigars marked with the Monte Cristi name are spotted in the market. Seizures of Monte Cristi COHIBA cigars have been made by customs agents over the last few years.

Parker traveled to the Dominican Republic in May 1997 for the specific purpose of importing popular cigars such as Cohiba, Montecristo, Partaga, H. Uppman, Macanudo, and several others that he felt would sell in the United States. Parker, who was not previously in the cigar business, brought back a small quantity of Monte Cristi's cigars. The cigars were well-received, and GDM determined that it would be able to supply the cigars to companies to whom General Cigar would not sell its COHIBA cigars.

GDM was aware of General Cigar's registration of the COHIBA mark. In September of 1997, Parker conducted a trademark search of COHIBA, which showed that General Cigar's trademark had been challenged by Empresa Cubana del Tabaco, d.b.a. Cubatabaco, ("Cubatabaco"), a Cuban company, on January 15, 1997, on the grounds that Cubatabaco had registered the COHIBA mark in Cuba in 1972, and used the mark continuous-

ly since that time in Cuba and internationally. GDM was also aware of the seizure of Monte Cristi's COHIBA cigars by customs officials; Parker testified that GDM imported the cigars without labels, and labeled and boxed the cigars here in the United States in an attempt to avoid such seizures.

The box used by GDM is a deep, rectangular wooden container. The lid is emblazoned with a human profile, which appears to resemble an Indian. Beneath the profile are the words "COHIBA PIRAMIDES" in bold capital letters. At the top left hand corner of the lid is a paper band, pasted diagonally across the corner, with the words "TABACOS DOMINICANOS" printed in capital letters, and a colored border across the top. The front of the box bears the legend "25 COHIBA PIRAMIDES Hecho a Mano." The end of the box bears the legend "Republica Dominicana" in bold, capital letters. The bottom of the container is stamped in the middle with a box stating "HAND MADE DOMINICAN REPUBLIC ... Cert.Ind. 55,555." Along the side, below the stamp, the words "LAS AUTORIDADES SANTARIAS ADVIERTEN QUÉ FUMAR PER JUDICIA SERIAMENTE LA SALUD." The cigars themselves are individually wrapped in plastic. Around the end is a banded label, bearing the words COHIBA in bold capital letters. A black border covered with white dots runs along the top of the label; an orange border with the words "REPUBLICA DOMINICANA" runs along the bottom of the label.

In October of 1997, GDM disseminated a sales sheet to cigar retailers, offering "premium cigars imported directly from the Dominican Republic ... COHIBA—Dominicana" at prices comparable to those set for General Cigar's COHIBA cigars. The sales sheet stated the following:

> Last July, the federal registration of the Cohiba trademark by General Cigar was suspended. Global Direct Marketing is proud to announce exclusive distribution of the *original* Dominican Cohiba. The Dominican Cohiba has been produced by the Monti Cristi [sic] factory in Santiago for the past 15 years and carries the familiar yellow/orange and black ring that is familiar throughout the world. Please do not confuse this cigar with the "new" Cohiba produced by General Cigar. There are no similarities.

The sales sheet was disseminated to cigar retailers, including at least one of General Cigar's customers.

A second version of the sales sheet carried an attached letter from the law office of Charles H. Knull, ("Knull"), GDM's counsel. The letter purported to offer a legal opinion concerning the status of General Cigar's COHIBA trademark. The letter stated that the Cuban Government's tobacco enterprise had presented a challenge to General Cigar's COHIBA trademark before the Trademark Trial and Appeals Board at the United States Patent and Trademark Office, and that this challenge had caused the suspension of General Cigar's trademark application for COHIBA and should "ultimately cause the cancellation of prior COHIBA registrations made by General Cigar for COHIBA." The letter also claimed that, "unlike General Cigar's mark", GDM's mark, COHIBA REPUBLICA DOMINICANA, was not misleading as to the origin of the cigars. This letter was also disseminated to cigar retailers.

On November 12, 1997, GDM entered an agreement with the Speakeasy Cigar Company, Inc., an Illinois Corporation, ("Speakeasy"), which states that the "officers and Agents of Monte Cristi have verbally granted to GDM what is represented to be the exclusive rights to import into, and market the COHIBA Republica Dominica brand of premium cigars in the United States" and appoints Speakeasy as the exclusive marketing agent and sales representative for the sale of GDM's COHIBA cigars. The agreement with Speakeasy refers to COHIBA Republica Dominica as a "properly registered trademark in the Dominican Republic." According to Parker's testimony, the COHIBA mark was registered in the Dominican Republic on December 15, 1992 in the name of the Monte Cristi Cigar Company.

Parker testified that a preliminary injunction aimed at preventing use of the COHIBA mark would put GDM out of business. He also testified that the imported cigars are not banded with GDM's COHIBA label and

placed in GDM'S COHIBA boxes until after they arrive in the New York area, and that GDM would be able to print new bands and boxes and use the new items to sell their imported cigars. Finally, Parker testified that Monte Cristi is the only supplier of cigars to GDM.

### Quality of GDM's COHIBA and General Cigar's COHIBA

The GDM COHIBA cigar is manufactured in an inferior manner to those of General Cigar, as evidenced by the inconsistency in the shape of the head of the cigar, the length of the cigar and the color of the wrapper. Further, the GDM cigars were made by a method called "booking", in which the tobacco is put into the cigar folded like a book. Booking creates tunnels which make the cigar burn poorly. Geoghegan testified that the taste of the GDM cigar, several of which he had smoked, was harsher and "younger" than the taste of General Cigar's COHIBA cigars. In contrast, General Cigar's COHIBA is rolled rather than booked, which means that each leaf is rolled individually into the bundle, providing a consistent burn. The wrapper of the General Cigar Cohiba is aged three years, and the tobacco filler is also aged, which provides a smoother, mellower taste.

### General Cigar's Attempts to Protect Its Trademark

Wollen testified that General Cigar first became aware of GDM's infringing use of the COHIBA mark in July of 1997. General Cigar sent a cease and desist letter to GDM on July, 28 1997. GDM did not respond to this letter, nor was the letter returned by the post office.

In October 1997, Wollen received from one of General Cigar's customers a copy of the sales sheet issued by GDM. On October 16, 1997, Wollen received a phone call from one of his customers, who faxed Wollen the second version of the sales sheet, with the letter from Knull attached.

Wollen then left a phone message with Knull, reading aloud the terms of General Cigar's cease and desist letter, and demanding that Knull meet with GDM and correct the situation. The same day, General Cigar's

attorney sent Knull a letter demanding that Knull tell GDM to cease and desist from further dissemination or publication of his opinion. Knull responded, stating that he had requested GDM not to disseminate his opinion letter any further. Knull acknowledged that the suspension of a trademark registration application mentioned in his first letter was not the result of the Cubatabaco action. The application Knull had referred to was filed by General Cigar in 1996, in order to use the COHIBA mark on products other than cigars. In his responsive letter, Knull conceded that this application had been suspended as the result of an application from a Mexican company to use the mark on alcoholic beverages.

### Evidence of Confusion

Parker testified in his deposition that retailers approached by GDM "were curious as to where the [COHIBA] cigar that we [GDM] were selling was from" and "were wondering if now this [GDM COHIBA cigar] was a General Cigar product or a different Cohiba cigar." Parker also testified that:

> As we spoke to retailers on a daily basis, occasionally we would have a retailer ask us if this was the General Cigar product or perhaps they thought that General Cigar was the only one selling the Cohiba cigar, and through the hundreds of contacts we made, the question would pop up enough
> . . .

Geoghegan testified that shortly before the hearing, Neiman Marcus, one of General Cigar's premier customers, contacted General Cigar and wanted to know why COHIBA cigars were appearing in so many retail shops. Geoghegan also noted similar instances of confusion with other customers who had received GDM's sales literature:

> retailers with whom we had fairly long standing business relationships with . . . were asking where these cigars came from and were they ours . . . whose were they and they wanted to know what they were made of and they wanted to know the quality difference, questions we couldn't answer. It was very confusing.

Geoghegan further testified that a wholesale cigar distributor in Richmond, Virginia, who

was not a customer of General Cigar's, called to inquire whether some Cohiba cigars that he had received a solicitation for were those manufactured by General Cigar. Geoghegan informed the retailer that he would sell these counterfeit cigars at his own risk, because General Cigar has had such counterfeits seized in the past.

Perez testified that customers who had seen COHIBA cigars at other retailers were questioning Dunhill as to whether its distribution of COHIBA cigars was truly on an exclusive basis. Perez felt the confusion was sufficiently significant to require an internal memorandum to Dunhill's stores, alerting the store managers to the existence of counterfeit COHIBA cigars from the Monte Cristi factory.

### Conclusions of Law

■ A motion for a preliminary injunction against a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of irreparable injury. *Richard Feiner and Company, Inc. v. Turner Entertainment Co.; MGM/ UA*, 98 F.3d 33, 34 (2d Cir.1996); *Fisher–Price, Inc. v. Well–Made Toy Manufacturing Corp.*, 25 F.3d 119, 122 (2d Cir.1994); *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985); *Topps Company, Inc. v. Gerrit J. Verburg Co.*, No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec.13, 1996).

### I. General Cigar is Likely to Prevail in Its Trademark Infringement Action

■ To succeed in a trademark infringement case, plaintiff must show: (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) defendants' use of their mark to identify their goods is likely to create confusion concerning the origin of the goods. *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993); *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F.Supp. 1060, 1063 (S.D.N.Y.1991).

### A. Validity of General Cigar's Trademark

As set forth above, General Cigar presented evidence of two registrations of the CO- HIBA mark. The first was issued in 1981 and simply consisted of the word COHIBA. The second was issued in 1995 and consisted of the word COHIBA in specific, bold, capital letters. General Cigar asserts that these registrations are in full force and effect, and that the 1981 registration has achieved incontestability, pursuant to 15 U.S.C. § 1065.

GDM asserts various challenges to the validity of General Cigar's registrations, which are: that the mark was abandoned; that General Cigar committed fraud and misrepresentation in its registration applications; and that third party rights to the mark exist which invalidate General Cigar's claims. These challenges will be considered *seriatim*.

### i. Abandonment: Non-use

GDM initially asserted that General Cigar abandoned the COHIBA mark twice, first from 1979 through 1981, second from 1988 through 1991. In closing arguments, GDM's counsel retreated from his assertion that the 1979–1981 period constituted abandonment. Because General Cigar's 1992 registration of the COHIBA trademark is sufficient to sustain its rights as against GDM, the issue of the validity of the earlier registration need not be considered on this motion.[3]

---

**3.** GDM initially contended that the sales of General Cigar's COHIBA cigars in 1978 merely constituted "token use", insufficient to support issue of the trademark registration in 1981. Prior to the 1989 revisions in the Trademark law, applicants for trademark registration were to demonstrate actual use in interstate commerce. General Cigar contends that the sales made in 1978 were sufficient to support its application for registration. At that time, adoption and a single use of a mark were sufficient to permit registration, particularly if the applicant evinced an intent to use the mark in interstate commerce. *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir.1974); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir.1956); *Scholastic v. Macmillan, Inc.*, 650 F.Supp. 866, 873 (S.D.N.Y. 1987). Moreover, some caution in launching the product in interstate commerce prior to final issue of trademark registration was not considered unreasonable. *Fort Howard Paper Co. v. Kimberly–Clark Corp.*, 55 C.C.P.A. 947, 390 F.2d 1015, 1017 (C.C.P.A.1968). More was required,

Section 45 of the Trademark Act provides:

A mark shall be deemed to be "abandoned"—(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Non-use for three consecutive years shall be prima facie abandonment.

15 U.S.C. § 1127 (West 1998). Prior to the 1989 amendments to the Trademark Act, *prima facie* abandonment was established by two years of non-use.

■■■ A determination that a mark has been abandoned defeats the alleged owner's claim of priority:

Once abandoned, the mark reverts back to the public domain whereupon it may be appropriated by anyone who adopts the mark for his or her own use. Hence a party that is found to have abandoned its mark is deprived of any claim to priority in the mark before the date of abandonment and may regain rights in the mark only through subsequent use after the time of abandonment.

*Dial–A–Mattress*, 841 F.Supp. at 1355 (citing *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir.1980)). Because it constitutes a forfeiture of a property right, abandonment of a mark must be strictly proved, and statutory aid to such proof must be narrowly constructed. *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980).

■■■ The Second Circuit has found two elements necessary to find abandonment: (1) non-use and (2) intent not to resume use. *Stetson v. Howard D. Wolf & Associates*, 955 F.2d 847, 850 (2d Cir.1992) (citing *Silverman v. CBS Inc.*, 870 F.2d 40, 44 (2d Cir.1989)). Intent not to resume use must be inferred from circumstances, and consists of an intent not to resume within the reasonably foreseeable future rather than intent never to resume use at all. *Silverman* 870 F.2d at 46. The party claiming abandonment bears the burden of proof as to both elements. However where the statutory presumption of abandonment has been established by non-use for over two consecutive years, the trademark owner must demonstrate that circumstances do not justify the inference of an intent not to resume use. *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 99 (5th Cir.1983).

Intent to abandon has been confuted even where the period of non-use lasted longer than two years if the registrant made other efforts to maintain the commercial value of the mark during the period of non-use. In *Saratoga Vichy*, the defendant conducted no sales under its trademark, WATERS OF SARATOGA from 1971 to 1978, but explained this hiatus by the decision to withdraw from the mineral water business, and demonstrated that during the seven years of non-use, it had sought continuously to sell the business with its good will and trademark. *Saratoga Vichy*, 625 F.2d at 1044. The Second Circuit found "these facts are completely inconsistent with an intent to abandon the mark." *Id.* See also *Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d 1053, 1060 (2d Cir.1985) (efforts to sell trademark during several years of non-use defeat inference of intent to abandon mark). In *Adolphe Lafont, S.A. v. S.A.C.S.E. Societa Azioni Confezioni Sportive Ellera, S.P.A.*, 228 U.S.P.Q. 589, 1985 WL 71974 (TTAB 1985), the petitioner sent a single shipment of its trademarked garments in 1967, and a second shipment in 1975. The TTAB, noting that "intent is critical", held that the seven intervening years of non-use created a statutory presumption of an intent to abandon, but that evidence of the petition-

---

however, "if its owner seeks to use the mark to stifle the efforts of others." *Scholastic*, 650 F.Supp. at 872. In order to defeat allegations of abandonment during the 1979–81 period, General Cigar would need to demonstrate use during that period which was "deliberate and continuous, not sporadic, casual or transitory." *La Societe*, 495 F.2d at 1272. General Cigar asserts that the brief week of discovery prior to the preliminary injunction hearing was insufficient

to uncover receipts from so long ago. The weight of the evidence favors a determination that General Cigar's sales were sufficiently consistent from 1978 through 1988 to sustain the validity of the trademark, and to confer incontestable status. However, as noted above, immediate resolution of this issue is unnecessary to decide the preliminary injunction motion; therefore, resolution may await full discovery and trial.

er's attempts to find an acceptable distributor during that period defeated the presumption. *Id.* at 593–94.

General Cigar does not dispute that no sales of COHIBA cigars took place from 1988 through 1991. Instead, it explains this hiatus resulted from the "restaging" of its COHIBA cigars. The restaging consisted of the switch from the plastic cylindrical package to wooden box, the second registration of the trademark, and commencement of the tobacconist partnership program with Dunhill and Mike's Cigars.

■ Even if General Cigar had not come forward with evidence of an intent to resume use during the 1988 through 1991 hiatus, General Cigar established rights to the mark by filing the second trademark registration in 1992, and conducting sales from 1992 to the present. *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1354 (E.D.N.Y.1994) (citing *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d Cir. 1980)).[4] While a party who has abandoned its trademark rights cannot revive those rights by resumed use, 2 McCarthy, *Trademarks and Unfair Competition,* § 17:3 at 17–4 (1996), resumed use does establish a second priority date for rights to the trademark. In the instant action, General Cigar's 1992 sales and registration application precede GDM's first use of the mark in 1997, and therefore General Cigar retains rights to the mark superior to any right asserted by GDM.

### ii. *Abandonment: Assignment in Gross*

■ GDM also asserts that the COHIBA mark was abandoned at the point of its assignment by Culbro to General Cigar in 1987, on the grounds that this assignment did not include any good will. Because a trademark has no independent significance apart from the good will it symbolizes, 2 McCarthy, § 18:17, at 18–27; *Marshak v. Green,* 746

F.2d 927, 929 (2d Cir.1984), abandonment may be found where a mark has been assigned in gross, i.e., without accompanying good will. *Dial–A–Mattress,* 841 F.Supp. at 1354. Good will has been defined as "the value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company." *Dial–A–Mattress,* 841 S.Supp. at 1350.

■ Two tests have been identified for determining whether the assignment of a mark includes the passing of good will. The first test asks whether the assignee is able to go on in real continuity with the past. *Dial–A–Mattress,* 841 F.Supp. at 1350; *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 905 (E.D.N.Y.1988) (citing *Defiance Button,* 759 F.2d at 1060). The second test asks whether the assignee is producing a product substantially similar to that of the assignor such that consumers would not be deceived or harmed. *Bambu,* 683 F.Supp. at 905 (citing *Marshak,* 746 F.2d at 930). Both these tests are satisfied by the record. Sales of Culbro's COHIBA cigars occurred continuously from 1982 through 1987. The cigars were advertised in the catalogues of Iwan Reis & Co., which were nationally distributed. Given the sluggish state of the cigar market during these years, it is reasonable to infer that these sales created sufficient good will among cigar customers to support a transfer of the mark which would go on in real continuity with the past. Moreover, the cigar offered by General Cigar under the COHIBA mark was identical to that offered by Culbro; the transfer of the mark from parent to subsidiary posed no risk that consumers would be deceived regarding the source or quality of the product so designated:

Finally, as set forth above, even if accurate, the allegation of assignment-in-gross

4. Sales of the mark from the end of 1992 through 1996 are sufficiently substantial to refute GDM's contention that use of the mark prior to 1997 was designed merely to reserve trademark rights for future use. As set forth above, Perez' testimony established that from 1992, when Dunhill began offering General Cigar's COHIBA cigars,

sales were so swift that the product was seldom shelved before being shipped to ultimate consumers. General Cigar increased its advertising efforts in 1992, and then again substantially in 1997. Such steady efforts at sales and promotion defeats the inference of an intent to abandon the mark.

**660**

does not negate the interest acquired by General Cigar in 1992 through its sales, advertising and second registration application, all of which preceded GDM's use of the mark.

### iii. *Fraud and Misrepresentation in Registration*

GDM asserts that General Cigar's COHIBA trademark is invalid because its 1978 application was based on misrepresentations. Specifically, GDM contends that General Cigar should have revealed information to the PTO that, first, "cohiba" is the word for tobacco in the language of the Taino Indians, and, second, COHIBA is a famous brand in Cuba.

 Under the trademark doctrine of foreign equivalents, a registrant is required to disclose the English meaning of any foreign word used in the mark, in order to determine whether that foreign word is merely descriptive. *French Transit, Ltd. v. Modern Coupon Systems, Inc.*, 818 F.Supp. 635, 636 (S.D.N.Y.1993) (Citing 1 J. Thomas McCarthy, *Trademarks and Unfair Competition*, § 11.14 at 464–66 (2d ed. 1984)) *Pizzeria Uno Corporation v. Temple*, 747 F.2d 1522, 1531 (4th Cir.1984); *see also*, Trademark Manual of Examining Procedure, § 809.02 (requiring translation of non-English wording in trademark and publication of translation in Official Gazette and on registration certificate). Thus, GDM reasons, General Cigar's offer of the Spanish verb "cohabir" was insufficient; it should have offered the PTO the Taino translation, tobacco, which would have been deemed merely descriptive of the product, and therefore denied trademark protection.[5]

As evidence that General Cigar was aware of the Taino meaning of "cohiba", GDM points to the 1875 treatise on tobacco found in General Cigar's files, which relates the tale of the discovery of tobacco by a monk who met the Taino Indians while traveling with Columbus. This tale was presented on the labeling of General Cigar's COHIBA cigars starting in 1982. The fact that the history was used in packaging in 1982, however, does not establish General Cigar's awareness of this history at the time of the 1978 application four years earlier.

Descriptiveness is evaluated according to "that segment of the purchasing public which is familiar with that language." 1 McCarthy § 11.14, p. 464–65. The Second Circuit has held that:

> A word which is not in general or common use, and is unintelligible and non-descriptive to the general public, although it may be known to linguists and scientist, may be properly regarded as arbitrary and fanciful and capable of being used as a trademark or trade-name.

*Le Blume Import Co v. Coty*, 293 F. 344, 358 (2d Cir.1923); *see also*, *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 699 (2d Cir.1961) (in determining descriptive quality of trademark, only meaning to prospective purchasers of actual product is relevant; meaning to non-purchasing segment of population not important). It seems doubtful that prospective purchasers of COHIBA cigars, particularly in 1978, would make the association between the mark and a word in a language spoken by the indigenous population of the Dominican Republic.[6] The associations of linguists in the Taino language are

---

**5.** Merely descriptive marks are denied registration pursuant to 15 U.S.C. § 1052(e)(1), unless registrant can show acquired secondary meaning, pursuant to 15 U.S.C. § 1052(f). *Park 'N Fly v. Park & Fly, Inc.*, 489 F.Supp. 422, 424 (D.Mass.1979).

**6.** To establish the recognizability of "cohiba" as Taino for tobacco, GDM submitted an excerpt from the *Diccionario de Voces Indigenas de Puerto Rico*, (2d ed.1977), a dictionary of the indigenous languages of Puerto Rico, which included the word "cojiba", which was defined in Spanish as "Planta del tabaco, extensamente cultivada por los indigenas, y la cual utilizaban con fines

religiosos." GDM did not provide an English translation of this definition. GDM also submitted the excerpted print-out from an internet website entitled "Welcome to the New Taino Dictionary", which included the word "cojiba", which was translated as "rolled tabacco, [sic.] also a mix used in the Cohoba Ceremony." (Cohoba was defined as "Sacred Ceremonial Snuff.. Also the name for the Sacred Taino Religeous [sic.] Cohoba Ceremony.") While the internet printout was admitted as relevant, it cannot be relied upon as evidence of knowledge of the Taino language among the purchasers of COHIBA cigars in the United States.

not relevant in this determination. More-over, it is not established that disclosure of the Taino meaning of the "cohiba" would have barred registration in 1978; General Cigar did disclose the Taino translation in its 1992 application for registration, and the registration issued without further inquiry.

■ GDM also asserts that Culbro's response to the PTO inquiry dated July 25, 1978, which stated that there was no meaning to COHIBA in the cigar industry was a misrepresentation, because Culbro was aware that Castro had developed a personal brand of cigar called COHIBA, which he distributed to friends and visitors, and which was world famous.

As evidence that General Cigar was aware of Castro's use of the COHIBA name in Cuba, GDM points to the internal notes dated December 14, 1977, which state "COHIBA—sell in Cuba—brand in Cuba—Castro's brand cigars." GDM also offered an internet print-out of an interview with Oscar Boruchin, proprietor of Mike's Cigars, and formerly regional manager for General Cigar which was published in Cigar Aficianado in the March/April 1997 issue.[7] In the interview, Boruchin relates the history of General cigar's knowledge of Cuban COHIBA cigars:

> In the 70's, a friend of mine, Bernardo Benes, was retained by the Carter Administration. Bernardo had been a friend of Fidel in Havana University ... One time he came back from Cuba and he gave me a little pack with four or five laneros. And he told me these are cigars that Fidel smokes that he gives to people that visit with him. The cigar is not a commercial brand. At that time, they didn't ever dream that they were going to make it commercial. I was working for General Cigar at that time and, loyal employee that I was, I sent the bands and a couple of cigars to Edgar Cullman Jr. And I told the Cullmans the story that I just told you. And General went ahead and registered the brand. And sure enough, nobody had an intent to register it then because the brand wasn't even commercially available.

7. The interview is, of course, hearsay, offered not for the truth of the matter asserted, but merely to show the state of knowledge among the officers

So, General Cigar owns the brand in the United States.

Interview with Oscar Boruchin, *Cigar Aficianado*, March/April 1997.

The information in this interview fails to support GDM's contention that General Cigar was required to disclose the tale of Castro's use of COHIBA cigars. Boruchin states in his interview that COHIBA cigars were not commercially available in Cuba at the time that General Cigar registered the mark. Trademark protection is available only to marks used in commerce. 15 U.S.C. § 1051(c). Nor does this record establish that the word COHIBA retained significance in the industry in 1978. Culbro learned of the cigar from Boruchin, who learned from a personal friend, who was a personal friend of Castro. GDM has not demonstrated that this knowledge was available other than by these private channels of communication.

### iv. *Bad Faith*

GDM'S final challenge to General Cigar's registration relies upon the cancellation action brought by Cubatabaco before the TTAB against General Cigar. GDM asserts that the cancellation proceedings "throw a cloud over [General Cigar's] ownership of the mark." Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, October 27, 1997, at 12. GDM lists in detail the grounds cited by Cubatabaco in support of its cancellation action, which has now been filed before this Court, presumably to urge these contentions in support of GDM's own position.

■ Assertion of the rights of third parties are termed a *jus tertii* defense:

> [J]us tertii in the trademark context arises when defendant alleges that plaintiff has no "title" because plaintiff itself is an infringer of a third party with rights allegedly superior to plaintiff. Defendant in effect argues that, "Somebody has a right to sue me, but it's not you."

4 McCarthy § 31:157 at 31–240 (1996). The Second Circuit has disfavored this defense:

of General Cigar regarding the Cuban COHIBA cigar at the time General Cigar sought to register the COHIBA mark. Fed.R.Evid. 801(c), 803(3).

Whatever may be [the third-party's] rights, unfair competition is a trespass, and no trespasser can justify by setting up the right of one to whom he is a legal stranger.

*National Picture Theatres v. Foundation Film Corp,* 266 F. 208, 211 (2d Cir.1920); *see also, Marshak v. Sheppard,* 666 F.Supp. 590, 599 (S.D.N.Y.1987) ("To permit a *jus tertii* defense would be an unwise judicial policy because it would expand many trademark disputes far beyond a mere two party conflict."); *Bambu,* 683 F.Supp. at 909 ("Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world."). Whether or not Cubatabaco enjoys trademark rights superior to those of General Cigar will be resolved in a separate action; Cubatabaco's rights cannot constitute a defense in an infringement action against GDM.

### v. *Laches*

■ GDM contends that General Cigar delayed in bringing this preliminary injunction motion, as well as the underlying action, and that the delay negates General Cigar's claim of irreparable harm.

It has often been held that a delay in suing or moving for a preliminary injunction will result in defeat of the motion, not upon strict grounds of laches, but upon the ground that delay negates the moving party's ability to show the kind of "irreparable injury" needed for preliminary relief ... [a] defendant's proof of plaintiff's unexplained delay can rebut that presumption [of irreparable harm] ... Lack of diligence, even without prejudice to defendant, may preclude preliminary injunctive relief.

4 McCarthy, § 31:32, at 31–61 to 31–62; *see also, Majorica S.A. v. R.H. Macy & Co.,* 762 F.2d 7, 8 (2d Cir.1985) ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.") (citing *Citibank N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985)).

GDM does not assert any delay in the action against itself; rather, it contends that General Cigar has known that GDM's exclusive supplier, Monte Cristi, has been importing COHIBA cigars into the United States for a number of years, and has taken no action against that manufacturer for at least three years. According to Wollen, General Cigar first learned of Monte Cristi's imports of COHIBA cigars in 1995. Since that time it has cooperated with its main competitor, Consolidated Cigar, ("Consolidated"), in a lawsuit which Consolidated brought against Monte Cristi in the Dominican Republic. General Cigar has also instructed its employees to immediately notify Wollen if they see cigars marked with the Monte Cristi name.

Whether or not General Cigar's efforts against Monte Cristi are insufficient, and therefore constitute delay, the irreparable harm claimed by General Cigar is the result of GDM's infringing activities, not those of Monte Cristi. Parker, GDM's president, testified that GDM places the COHIBA labels on Monte Cristi's cigars, and provides the COHIBA boxes for packaging. GDM performs these activities because enforcement against Monte Cristi has led to seizures of its COHIBA labeled cigars by customs.

■ As against GDM, General Cigar has not delayed. General Cigar first learned of GDM's activities in July 1997. A cease and desist letter was sent on July 28, 1997. General Cigar next received information regarding GDM in mid-October 1997 in the form of GDM's sales sheet. On October 16, Wollen received a phone call and a fax copy of GDM's sales sheet with an attachment asserting that General Cigar's COHIBA trademark was being suspended. Wollen immediately left a voice mail message for GDM's counsel, reading aloud General Cigar's cease and desist letter. That same day, General Cigar's counsel sent a warning letter to GDM's counsel. On October 17, 1997, GDM's counsel responded to the letter, partially withdrawing GDM's statements regarding the cancellation of the trademark. On October 18, 1997, General Cigar's counsel sent another letter to GDM's counsel, asking for a signed letter of full withdrawal by October 20, 1997. When no letter of with-

drawal was forthcoming, General Cigar filed this action on October 21, 1997. The motion for preliminary injunction was brought on October 29, 1997.

The delay of three months from the first indication of GDM's activities in July to the filing of this action in October is insufficient to negate General Cigar's claim of irreparable harm. Moreover, there was no delay in activity once General Cigar received GDM's sales sheet claiming that the COHIBA trademark registration had been canceled. Preliminary injunctive relief is most often denied when there is a period of inaction between the last communication between plaintiff and defendant. *See, Mathematica Policy Research, Inc. v. Addison–Wesley Publishing Co.,* 11 U.S.P.Q .2d 1391, 1392 (S.D.N.Y.1989) (no injunctive relief for plaintiff whose last communication with defendant occurred on October 31, 1988, and action not filed until May 17, 1989); *The Comic Strip, Inc. v. Fox Television Stations, Inc.,* 710 F.Supp. 976, (S.D.N.Y.1989) (no injunctive relief where last communications between plaintiff and defendant occurred in November and December 1988 and action not commenced until March 15, 1989); *Nina Ricci, S .A.R.L. v. Gemcraft Ltd.,* 612 F.Supp. 1520, 1530 (S.D.N.Y.1985) (no injunctive relief where plaintiff sent cease and desist letters in December 1984, parties communicated by phone between January 16 and February 1, 1985, and action not filed until March 15, 1985). Here, General Cigar's immediate and continuous enforcement of its rights only supports the presumption of irreparable injury.

## B. *Likelihood of Confusion*

The determination of whether a likelihood of confusion exists involves the balancing of factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). The factors are: (1) the strength of the prior owner's mark; (2) the similarity between the two marks; (3) the competitive proximity of the products; (4) the quality of the defendant's products; (5) the sophistication of the buyers; (6) the likelihood that the prior user will bridge the gap; (7) evidence of actual confusion; and (8) the defendant's bad faith in adopting its mark.

The evaluation of the *Polaroid* factors should not be mechanical, nor is any single factor determinative. *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983); *Kookai, S.A. v. Shabo,* 950 F.Supp. 605, 607 (S.D.N.Y.1997). The court "should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577, 584 (2d Cir.1993) (citing *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991)).

### i. *Strength of General Cigar's COHIBA Mark*

The strength of a mark depends on its distinctiveness, or more precisely, "its tendency to identify the goods sold under the mark as emanating from a particular source." *Lois Sportswear, U.S.A. Inc. v. Levi Strauss & Company,* 799 F.2d 867, 873 (2d Cir.1986). Two factors may be used to measure the relative strength of the mark: (1) the level of protection of a mark; and (2) the recognition value of the mark in the marketplace as identifying the source of the goods or services. *Gucci America, Inc. v. Action Activewear, Inc.,* 759 F.Supp. 1060, 1063 (S.D.N.Y.1991).

As to the first factor, registration of a trademark establishes a presumption that it is distinctive and should receive the utmost protection. *Lois Sportswear, U.S.A., Inc.,* 799 F.2d at 871; *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 687 F.2d 563, 567 (2d Cir.1982).

As to the second factor, General Cigar is the exclusive source for COHIBA cigars in the United States. Testimony by Geoghegan and Perez established that there is a significant recognition level for General Cigar's COHIBA trademark. Geoghegan testified that, given the declining state of the premium cigar market from 1978 through 1992, the amount of sales and advertising of COHIBA cigars was adequate to reach the limited cigar-smoking public. From 1992 onwards, according to Perez' testimony, Dunhill has had difficulty keeping any COHIBA cigars in stock. Finally, Parker testified that GDM's customers inquired as to whether the COHI-

BA cigar GDM offered was the General Cigar COHIBA, indicating a knowledge and recognition of General Cigar's brand prior to GDM's entry in the cigar market. Thus, the strength of General Cigar's COHIBA mark weighs towards a likelihood of confusion.

### ii. *Similarity Between Two Marks*

The court must consider whether the similarity of the marks is likely to provoke confusion among potential customers, as adjudged by the products' sizes, logos, typefaces and package designs and colors. *W.W.W. Pharmaceutical v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993).

The labels of the two COHIBA cigars are similar, although not identical. Both employ simple, bold, capital letters to spell the word COHIBA in black against â white background. General Cigar's label is bordered in black, the center of the "O" in COHIBA is colored red, and a small red square on the back of the cigar states "HAND MADE" in white letters. GDM's label gives the impression of being bordered in black on the top, although the black band is ornamented with three rows of white dots. The bottom of the label is bordered in orange, with the words "REPUBLICA DOMINICANA" in small black letters.

Limited similarity between the marks is not in itself dispositive. The issue is whether the "impression which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark." *McGregor–Doniger v. Drizzle*, 599 F.2d 1126, 1134 (2d Cir.1979); *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F.Supp. 966, 978 (E.D.N.Y.1994) (finding that differences between labels did not negate overall confusing impression). The general impression left by the labels is one of similarity in source: both are banded; both figure the word COHIBA prominently. Moreover, despite differences, it appears that the similarity has led to confusion on the part of the public. As set forth above, cigar customers who were sold or offered GDM's COHIBA cigars contacted Parker, Geoghegan and Perez to ask if the cigars were the product of General Cigar.

This evidence of confusing similarity indicates a likelihood of confusion.

### iii. *Proximity of the Products*

The proximity of the products weighs strongly towards a likelihood of confusion. Both GDM and General Cigar sell cigars to retailers which are imported into the United States from the Dominican Republic and are destined for ultimate consumption by the premium cigar-smoking public. Thus, the two COHIBA marks are identical in content, geographic distribution, market position and audience appeal. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985).

### iv. *Quality of GDM's Cigars*

Testimony established that GDM's cigars are made in an inferior manner and are of an inferior quality compared to those of General Cigar. While the only testimony provided on this topic came from General Cigar, and was admittedly biased, GDM did not provide rebuttal of General Cigar's assertions. This lack of testimony from GDM necessitates that this factor be weighed towards a likelihood of confusion.

### v. *Sophistication of the Buyers*

The initial customers for both GDM and General Cigar are retailers of expensive, premium cigars, and are therefore highly sophisticated as to cigar labeling. Ultimate consumers of the cigars are men sufficiently enthusiastic about smoking cigars to spend a significant amount of money on that pleasure, and are therefore presumably discerning purchasers. Courts generally assume that more sophisticated purchasers are less likely to be confused. *Kookai*, 950 F.Supp. at 609. However, as set forth below, testimony established actual confusion on the part of some highly sophisticated cigar customers, ranging from Neiman Marcus to individual Dunhill customers.

### vi. *Evidence of Actual confusion*

General Cigar submitted no surveys of customers to establish actual confusion in the numbers usually required for this factor. However, anecdotal testimony raised the inference of actual confusion on the part of some cigar consumers. As set forth above,

GDM's own testimony provided evidence that some retailers approached by GDM wondered if their product was a General Cigar COHIBA. General Cigar provided testimony that Neiman Marcus called and asked why General Cigar's exclusively marketed COHIBA cigars were appearing in so many retail shops. In addition, a wholesale cigar distributor who was not a customer of General Cigar's called to inquire whether COHIBA cigars he had been offered were those manufactured by General Cigar. Perez testified that a sufficient number of customers called Dunhill to ask about the source of counterfeit COHIBA cigars that Perez was prompted to circulate an internal memorandum warning Dunhill employees to watch for GDM's product.

### vii. *GDM's Bad Faith*

GDM has not denied that it was aware of General Cigar's registration of the COHIBA trademark, and aware that Monte Cristi's COHIBA cigars were being seized by custom officials as counterfeit. GDM specifically arranged delivery of unlabeled Monte Cristi cigars, and attached infringing COHIBA labels in this country to avoid such seizures.

Weighing all the factors in the Polaroid test, it appears extremely likely that confusion will occur between the COHIBA marks used by GDM and General Cigar. General Cigar has therefore established a likelihood of success on its infringement claim.

Once a high probability of consumer confusion is established, irreparable harm is also established. *Church of Scientology Intern. v. Elmira Mission,* 794 F.2d 38, 41 (2d Cir. 1986); *Kookai,* 950 F.Supp. at 609. Irreparable injury in an infringement action consists of the plaintiff's loss of control over its mark. *Church of Scientology,* 794 F.2d at 43; *Brunckhorst,* 875 F.Supp. at 985. As set forth in the classic description of harm by Judge Learned Hand:

> [A Plaintiff's] mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a

reputation, like a face, is a symbol of its possessor and creator, and another can use it only as a mask.

*Yale Elec Corp v. Robertson,* 26 F.2d 972, 974 (2d Cir.1928); *Brunckhorst, supra.* The strong showing of likelihood of confusion made by General Cigar suffices to establish irreparable harm to that company.

### II. *General Cigar is Likely to Prevail in its False Representation Claim*

Section 43 (a) of the Trademark Act, 15 U.S.C. § 1125(a), provides a cause of action against "any person who ... misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities" for any person who "believes that he or she is likely to be damaged by such act." To establish a claim for false advertising or representation under the Trademark Act, a plaintiff must show that the defendant:

> (1) has made material misrepresentations about the nature, characteristics or geographic origin of either defendant's or plaintiff's goods; (2) has used false or misleading representations "in commerce"; (3) has made the representations in the context of commercial advertising or commercial promotion; and (4) has made plaintiff believe that it is likely to be damaged by the misrepresentations.

*Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005, 1019 (S.D.N.Y.1994).

### A. *Falsity or Confusion of Representations*

To obtain preliminary injunctive relief under § 43(a), the plaintiff must show either that the challenged advertisement is literally false, or that, while the advertisement is literally true, it is nevertheless likely to mislead or confuse consumers. *Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297 (2d Cir.1992); *Hertz Corporation v. Avis Inc.,* 867 F.Supp. 208, 212 (S.D.N.Y.1994). A court may determine, based on its own common sense and logic in interpreting the message, whether or not an advertisement or representation made in a

commercial context is literally true or false. *Hertz*, 867 F.Supp. at 212 (S.D.N.Y.1994) (citing *Johnson & Johnson v. GAC Int'l, Inc. .*, 862 F.2d 975, 980–82 (2d Cir.1988)). Consumer surveys are not necessary to a determination of literal falsity. *Id.* Review of the statements in GDM's sales sheet and legal opinion letter reveals that General Cigar has demonstrated the literal falsity required for injunctive relief.

As set forth above, GDM disseminated a sales sheet to cigar retailers and an attachment presenting a legal opinion regarding the status of General Cigar's COHIBA trademark. Both contained statements which were literally false.

The sales sheet stated that GDM's COHIBA was the "exclusive" and "original" Dominican Cohiba made by the Monte Cristi factory for "the past 15 years", and disparaged General Cigar's cigar as the "new" COHIBA. General Cigar presented evidence that its COHIBA has been manufactured in the Dominican Republic since 1977. GDM has presented no evidence to support its claim that Monte Cristi began manufacturing COHIBA cigars prior to the Dominican factory used by General Cigar. Nor could GDM claim to be the "exclusive" distributor of Dominican COHIBA cigars. GDM did not enter an agreement of exclusivity with Monte Cristi until November 12, 1997, more than a month after making the claim in its sales sheet. In his deposition on November 10, 1997, Parker admitted that Monte Cristi has been allowing others to import the cigars into the United States. Moreover, General Cigar's COHIBA cigars are also manufactured in the Dominican Republic, thus negating any claim of exclusivity as to "Dominican COHIBA cigars".

The attached letter from Knull stated that the Cuban Government's challenge to General Cigar's trademark led to the suspension of General Cigar's trademark application for COHIBA, "and should ultimately cause the cancellation of prior COHIBA registrations made by General Cigar for COHIBA." This statement is literally false, as admitted in a letter from Knull to General Cigar's attorney. The suspension of General Cigar's 1996 application to use the COHIBA mark for other products was suspended as a result of a Mexican application regarding alcoholic beverages, not by the challenge brought by Cubatabaco.

## B. *The Misrepresentations Were Made in Commerce as Part of a Commercial Promotion*

Representations constitute commercial advertising or promotion if they (1) are commercial speech (2) made by a defendant who is in commercial competition with the plaintiff (3) for the purpose of influencing consumers to buy defendant's goods or services (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. *Gordon and Breach Science Publishers v. AIP,* 859 F.Supp. 1521, 1536 (S.D.N.Y.1994).

The literally false statements above were made as part of a sales sheet and promotion sent to cigar retailers, the immediate customers of both GDM and General Cigar. There is no dispute that GDM and General Cigar are in commercial competition. Nor can it be argued that the sales sheet and letter were disseminated for any purpose other than influencing consumers to buy GDM's COHIBA cigars and not those of General Cigar. Finally, the dissemination of the sales sheets with prices attached urging cigar retailers to avail themselves of GDM's stock leave no doubt that they were sent to the relevant purchasing public and meant to constitute promotion in the retail industry of premium cigars.

## C. *General Cigar's Reasonable Belief that Damage will Result from GDM's False Representations*

To prove irreparable injury under § 43(a) of the Trademark Act, 15 U.S.C. § 1125(a), General Cigar must demonstrate a reasonable basis for the belief that it is likely to be damaged as a result of GDM's false advertising. *Kookai,* 950 F.Supp. at 609. No proof of actual sales diversion is required. *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 278 (2d Cir.1981). When a merchandising statement or representation is literally or explicitly false, relief may be granted without reference to the advertisement's

impact on the buying public. *Mobius,* 880 F.Supp. at 1022. The literal falsity of GDM's sales sheet, as set forth above, support the grant of injunctive relief as to General Cigar's false representation claim.

### III. *Balance of Hardships*

According to GDM, it will be forced out of business if prohibited from marketing COHIBA cigars. However, Parker also testified that the cigars imported from Monte Cristi are labeled and boxed here in the United States, and that the labels and boxes could be altered to remove the COHIBA mark.

General Cigar has been marketing COHIBA cigars since 1977. While the sales of COHIBA cigars waned at certain points, this seems largely to reflect the state of the cigar market. Since 1992, General Cigar has built the reputation and good will attached to its COHIBA cigar to new heights. That reputation appears to be in jeopardy from GDM's use of a confusingly similar mark and of literally false representations in regard to its own and General Cigar's mark. GDM has been marketing COHIBA cigars for less than a year. Based on testimony by Parker and Geoghegan regarding customer inquiries as to whether GDM's product is that of General Cigar, it would not be unreasonable to attribute any success GDM has experienced to its incursions into the good will built by General Cigar over the last two decades. Based on these circumstances, it appears that the hardship to GDM from issue of an injunction cannot outbalance the harm to General Cigar from GDM's continued infringing activities.

### *Conclusion*

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that GDM is enjoined from (1) using the mark COHIBA or any other mark confusingly similar to General Cigar's COHIBA mark to identify services constituting or relating to cigars; (2) making any false or misleading statement about General Cigar's COHIBA cigars or COHIBA mark which misrepresent the nature, characteristics or qualities of General Cigar's goods or trademark. GDM is also ordered to recall all cigars which GDM has distributed or sold which bear the infringing COHIBA mark,

and to inform their customers that they cannot sell COHIBA cigars in the United States, and that all their COHIBA cigar sales have been unauthorized.

Settle order on notice.

It is so ordered.